453 F.2d 565
 79 L.R.R.M. (BNA) 2153, 67 Lab.Cas. P 12,318
 James D. HODGSON, Secretary of Labor,
Plaintiff-Appellant-Cross-Appellee,
v.
LOCAL 1299, UNITED STEELWORKERS OF AMERICA, AFL-CIO, and
United Steelworkers of America, AFL-CIO,
Defendants-Appellees-Cross-Appellants.
 Nos. 71-1293, 71-1297.
 United States Court of Appeals,
Sixth Circuit.
 Dec. 29, 1971.
 
 Michael H. Stein, Dept. of Justice, Washington, D. C. (L. Patrick Gray, III, Asst. Atty. Gen., Walter H. Fleischer, Atty., Dept. of Justice, Washington, D. C., Ralph B. Guy, Jr., U. S. Atty., Detroit, Mich., on the brief), for Hodgson.
 Carl B. Frankell, Pittsburgh, Pa. (Michael H. Gottesman, Washington, D. C., Allen J. Kovinsky, Detroit, Mich., on the brief), for Local Union, etc., and others; Bernard Kleiman, Chicago, Ill., of counsel.
 Before PHILLIPS, Chief Judge, and McCREE and MILLER, Circuit Judges.
 McCREE, Circuit Judge.
 
 
 1
 This appeal presents difficult questions concerning the requirement of the Landrum-Griffin Act that a union member exhaust all internal union remedies before the Secretary of Labor can entertain his complaint that provisions of the Act relating to union elections have been violated. We are also presented with questions concerning the scope of the remedial and supervisory powers over elections conferred on the Secretary by the Act. For the reasons set out below, we affirm in part and reverse in part the judgment of the District Court.
 
 
 2
 At the 1964 International Convention of the United Steelworkers of America, AFL-CIO (Steelworkers), the delegates approved an amendment to the International Constitution. The Constitution had provided that terms of office in each local would be two years, and that in order to be eligible to run for local office, a member must have attended at least one-half the local membership meetings over a two-year period. In 1962, the terms of office were lengthened to three years, and the 1964 amendment reflected this change by requiring as a condition for eligibility for local office that a member have attended one-half the meetings over a three-year period. An exemption was provided for members whose union activities or working hours prevented attendance.
 
 
 3
 Following the June 1967 series of Steelworkers local elections,[1] the Secretary of Labor, acting pursuant to Secs. 401 and 402 of the Labor Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. Secs. 481, 482,[2] filed eight lawsuits, including this one, in which he sought to set aside local elections on the ground, among others, that the Constitution's meeting-attendance rule imposed an unreasonable qualification on a member's right to run for union office.[3] Three of these suits ultimately went to trial, and in all three the District Court found the meeting-attendance rule reasonable. However, in Hodgson v. Local Union 6799, United Steelworkers of America, AFL-CIO, 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971), the Supreme Court held that the District Court should not have reached the issue of the reasonableness of the rule since that issue had not been raised by any member in the union's internal procedures. Accordingly, there had been no exhaustion of remedies as required by LMRDA Sec. 402(a) (1).
 
 
 
 * * *
 
 
 
 4
 * * *
 
 
 5
 This appeal concerns an election of officers of the 9,000-member Steelworkers Local 1299. Of the 67 candidates originally nominated for the 11 offices in the local, 22 eventually decided to run. The local's election committee then determined that three of the 22 were ineligible to run for office because of the meeting-attendance rule, which the committee interpreted to require attendance at 12 of 23 local meetings.[4]
 
 
 6
 The election was held June 28, 1967. Subsequently, several members lodged internal union protests concerning the conduct of the election. One group of protests-the "Stevenson" group-charged irregularities in a recount conducted on August 1, 1967, of the votes for treasurer and grievanceman. No mention was made of the meeting-attendance rule in these protests. The local denied the protests on August 2, 1967, and the International Executive Board Branch on October 10, 1967, affirmed the determination that no violations had occurred in the recount.
 
 
 7
 The other protests were made by Robert Morgan and Donald Gianni, candidates for division grievanceman. They were declared ineligible to run under the meeting-attendance rule because neither had attended at least 12 of the 23 meetings preceding the election. They claimed that the local officials had misread the language of the union's Constitution and by-laws and had not given those documents their "fullest meaning."[5] At trial, they testified in substance that they were protesting the election committee's decision to exclude from consideration the first 13 months of the three-year period preceding the election[6] for purposes of applying the meeting-attendance rule. Both asserted that they would have been eligible for election if the committee had applied the meetingattendance rule literally.[7] The Morgan-Gianni protests were rejected by the local on August 2, 1967, and by the International Executive Board on October 10, 1967.
 
 
 8
 On November 6, 1967, the Stevenson group filed with the Secretary a complaint alleging violation of the LMRDA in the recount procedures. After conducting an investigation of the entire election (and receiving a waiver from the union of the 60-day limit contained in LMRDA Sec. 402(b)), the Secretary, through his delegate, notified the Steelworkers on January 9, 1968, that he had probable cause to believe that the June 1967 election of officers of local 1299 violated LMRDA Secs. 401(c), (e), and (g) in the following respects: ballots were altered between the initial vote and the recount; members in good standing were denied the right to be candidates and to hold office because of the application of the Steelworkers' meeting-attendance rule; and union funds were used in various ways to promote the candidacy of incumbent officers.
 
 
 9
 The Steelworkers responded to this notification by reversing the earlier decision to disallow the Stevenson protests and ordering a new election for the positions of treasurer and grievanceman. On February 24, 1968, the Secretary was notified of this decision and was assured that the election would be held as soon as possible.
 
 
 10
 On March 1, 1968, the Secretary filed suit in the United States District Court to set aside the June 1967 election. The complaint alleged four violations of LMRDA Sec. 401: members in good standing were denied the right to be candidates and to hold office by the "imposition of unreasonable qualifications in violation of section 401(e)"; members were denied a reasonable opportunity to nominate, vote for, or otherwise support candidates of their choice, in violation of section 401(e); adequate safeguards to insure a fair election were not provided, in violation of section 401(c); and union funds were used to promote the candidacy of certain persons in violation of section 401(g). The Secretary requested that the June 1967 election be declared null and void in its entirety and that a new election be conducted "for all offices under the supervision of the plaintiff."
 
 
 11
 Defendants admitted the violation of section 401(c), which concerned the recount that was the subject of the Stevenson protests. They contended, however, that this violation was remedied by an election held April 18, 1968; that the Secretary had notice before he filed suit that this election was to be held; and, therefore, that the Secretary did not have jurisdiction to litigate this issue because the violation was remedied before he instituted his lawsuit. Defendants further contended that the Secretary could not litigate the other violations alleged on the ground that "said matters were not made the subject of protest within the union," as required by LMRDA Sec. 402(a) (1).
 
 
 12
 The District Court held that the admitted violation of section 401(c) could not be remedied after the Secretary's institution of litigation "by the union's running of a special, unsupervised election," on the authority of Wirtz v. Local 153, Glass Bottle Blowers Association of the United States and Canada, AFL-CIO, 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968). With respect to the section 401(g) charge, the court held that the union had been put on notice by the Secretary during his investigation, that the union had time to correct any irregularity, and that the exhaustion requirement of the LMRDA was thus satisfied. The court then found that section 401(g) had not been violated.
 
 
 13
 Finally, the court held that the issues raised under section 401(e) had been properly raised and exhausted by the Morgan-Gianni protest and that the Secretary could properly include these issues in his complaint even though the Stevenson group, which invoked his jurisdiction, had alleged only violations of section 401(c). Further, the Morgan-Gianni protests were held to have exhausted both the issue whether the meeting-attendance rule was uniformly and properly applied and the issue whether the rule itself imposed an unreasonable qualification on a member's eligibility to run for office. The court then ruled that the meeting-attendance requirement was not an unreasonable qualification and that the rule had been "uniformly imposed."
 
 
 14
 The court entered an order dismissing the portions of the Secretary's complaint charging violations of sections 401(e) and (g), and requiring an election to be held for the office of treasurer "under the supervision of the secretary." The Secretary then requested an order allowing him to supervise both the nominating and balloting aspects of the new election. The court denied this request on the ground that the Secretary's complaint sought relief with respect to the section 401(c) violation only for irregularities occurring in the balloting process. Accordingly, he held that the Secretary was only entitled to "supervise that portion of the election for which his complaint sought relief, namely the balloting of votes."
 
 
 15
 The Secretary has appealed from the judgment of the court dismissing his complaints of violations of LMRDA Secs. 401(e) and (g). He has also appealed from the court's order restricting his supervision of the election for treasurer to the balloting process. Defendants have cross-appealed the court's ordering of a supervised election for treasurer.
 
 
 16
 We hold that the court properly dismissed the complaints based on sections 401(e) and (g) of the LMRDA, but we do so on the basis of noncompliance with the exhaustion requirement of section 402(a) (1). We further hold that the court properly ordered a supervised election for the office of treasurer. We reverse, however, the court's determination that the Secretary's supervision of that election should be limited to its balloting aspects.
 
 
 17
 Section 402(a) of the LMRDA authorizes a union member "who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body" to file a complaint with the Secretary alleging a violation of section 401. The Supreme Court has twice considered this exhaustion provision, and we are therefore not without guidelines in our inquiry whether the rule has been satisfied in this case.
 
 
 18
 In Wirtz v. Local Number 125, Laborers' International Union of North America, AFL-CIO, 389 U.S. 477, 88 S.Ct. 639, 19 L.Ed.2d 716 (1968) (Laborers Union), the Secretary filed a complaint challenging the validity both of a general election of all local officers and of a subsequent runoff election necessitated by a tie vote for one office in the general election. The complaining union member had challenged internally only the validity of the runoff election. He alleged that members not in good standing had been allowed to vote in the election because of the practice of the local's secretary-treasurer of paying from local funds delinquent union dues of selected members. Under the local's constitution, failure to pay union dues resulted in the loss of all membership rights, one of which was the right to vote in local elections. Upon investigation, the Secretary discovered that, because of this practice, ineligible members had voted both in the runoff and in the general election, and that 16 of the 27 candidates in the general election had been improperly deemed eligible to run for the same reason. The Court held that the Secretary properly could challenge the general election because the union "had fair notice from the violation charged by [the complaining member] in his protest of the runoff election that the same unlawful conduct probably occurred at the earlier election as well." 389 U.S. at 481, 88 S.Ct. at 641. Analysis of the statutory language and the legislative history convinced the Court that it would be "anomalous to limit the reach of the Secretary's cause of action by the specifics of the union member's complaint," 389 U.S. at 483, 88 S.Ct. at 642. The dual objectives of fostering union self-government and responsibly redressing members' election grievances were seen by the Court to be "furthered by permitting the Secretary to include in his complaint at least any Sec. 401 violation he has discovered which the union had a fair opportunity to consider and redress in connection with a member's initial complaint." 389 U.S. at 484, 88 S.Ct. at 643.
 
 
 19
 Following the decision of the District Court in this case and the filing of an appeal to this court by the Secretary, the Supreme Court issued its decision in Hodgson v. Local Union 6799, United Steelworkers of America, AFL-CIO, 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971) (Local 6799). In that case, one Hantzis filed a written protest with his local after the June 1967 election. It included various procedural challenges and a charge that union facilities had been used to aid incumbents. He also attached a copy of a letter he had previously sent to the president of the International that questioned the International's decision to begin the computation period with the August 1965 meeting for purposes of the local's application of the meeting-attendance rule. Hantzis believed that the June and July meetings should be counted, and he enclosed a copy of this letter with his internal protest for the stated reason that he had not received a reply to it from the International.[8] Nevertheless, the Supreme Court stated that "[a]t no time during his internal union protests did Hantzis challenge the attendance requirement." 403 U.S. at 334-335, 91 S.Ct. at 1843. Hantzis' complaint to the Secretary did mention the meeting-attendance rule,[9] although, as the Court observed (403 U.S. at 335 n. 3, 91 S.Ct. 1841), it is unclear whether he was objecting to the validity of the rule or to the manner in which it was applied.
 
 
 20
 In any event, the Secretary's lawsuit challenged the election on the grounds of improper use of union facilities and of imposition of unreasonable eligibility requirements. The latter included a challenge both to the claimed non-uniform application of the meeting-attendance rule and to the validity of the rule itself. The Court, in rejecting the Secretary's contention that LMRDA section 402 authorized him to investigate and litigate all violations that may have affected an election once a member exhausted his internal remedies concerning any violation that occurred, held that "Hantzis' failure to object to the attendance rule during pursuit of his internal union remedies bars the Secretary from later challenging the rule in a Sec. 402(b) action." 403 U.S. at 336, 91 S.Ct. at 1844. Analysis of the legislative history of section 402 indicated to the Court "a clear congressional concern for the need to remedy abuses in union elections without departing needlessly from the longstanding congressional policy against unnecessary governmental interference with internal union affairs . . . ." 403 U.S. at 338, 91 S.Ct. at 1845. This concern could best be protected, the Court indicated, by giving the union the first opportunity to respond to its members' grievances and by permitting the Secretary to enter the dispute only when the union failed to take the necessary remedial steps.
 
 
 21
 In this case, it is undisputed that no member complained internally concerning the use of union funds and facilities to promote the candidacy of incumbent officers. Therefore, the decision in the Local 6799 case clearly precludes litigation of this issue, and the Secretary has so conceded. Accordingly, we affirm the District Court's dismissal of the complaint insofar as it related to violations of LMRDA Sec. 401(g).
 
 
 22
 The question whether the alleged section 401(e) violations were properly raised and exhausted internally, however, depends for its resolution on an accommodation of the policies expressed by the Supreme Court in the Laborers Union and Local 6799 decisions. More specifically, we must determine whether the union had fair notice that its members were complaining about the validity of the meeting-attendance rule.
 
 
 23
 The Morgan-Gianni protest, as noted previously, concerned the way in which the meeting-attendance rule was applied. On the question whether this protest raised the issue of the validity of the rule, the District Court made the following finding:
 
 
 24
 From the testimony and exhibits presented in this proceeding, it is apparent that the union was aware at the time of the initial complaint by these members that the challenge was as much to the attendance requirement itself as it was to the application of that requirement to particular members. The members questioned the very fairness of the meeting attendance rule, as well as asserting that it was unfairly applied. Therefore, no matter how inaccurately or incompletely the members worded their complaint, this Court finds that the union was apprised of the underlying challenge to the attendance requirement as a whole and therefore had fair notice of that complaint.
 
 
 25
 If this constitutes a finding of fact by the District Court, it should not be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a). A finding of fact is erroneous if it is not supported by evidence in the record. E. g., G. R. Leonard & Company v. Stack, 386 F.2d 38, 40 (7th Cir. 1967); American Transit Lines v. Smith, 246 F.2d 86, 88 (6th Cir. 1957).
 
 
 26
 In this case, there is no evidence whatsoever to support a finding that Morgan and Gianni protested the validity of the meeting-attendance rule. Nor is there anything but surmise upon which to base a finding that the union was aware of a protest to the meeting-attendance rule even though the members did not articulate anything resembling a challenge to the rule's validity.
 
 The Secretary argues that
 
 27
 Morgan and Gianni, the internal protestants, clearly put the union on notice that its meeting attendance rule was being challenged. Their specific complaint was that they were ineligible to run for election, and that they could not find enough members eligible to run for office to fill an entire election slate. The union could have remedied the complaint either by extending the period for which the rule applied to three years, as suggested by Morgan and Gianni, or by abolishing the rule.
 
 
 28
 The difficulty with this argument is that Morgan and Gianni clearly challenged only the manner in which the meeting-attendance rule was applied. This is apparent not only from the wording of their protest letters[10] but also from their testimony at trial.[11] We regard a request that the union determine eligibility under the meeting-attendance rule on the basis of attendance at 18 of 36 meetings as an express affirmation of the rule. We consider a request that the rule be applied literally to be quite different from a request that the rule be held invalid.
 
 
 29
 We are not unaware that the Court in Local 6799 required courts to "impose a heavy burden on the union to show that it could not in any way discern that a member was complaining of the violation in question." 403 U.S. at 341, 91 S.Ct. at 1846 (emphasis added). As the statement indicates, however, there must be something in the member's complaint itself that evinces a desire to challenge a given practice. And, although in analyzing the protest courts should not be confined by the artlessness of the member's complaint, Laborers Union, supra, 389 U.S. at 485, 88 S.Ct. 639, or the imprecision of his language, Local 6799, supra, 403 U.S. at 340, 91 S.Ct. 1841, a finding that a union had fair notice of a member's challenge to an election qualification must be based on more than speculation. Indeed, in Local 6799 itself, despite the member's inclusion with his protest letter of a copy of an earlier letter he had written requesting a change in the method of application of the meeting-attendance rule,[12] the Court stated that "it is clear that the protesting member knew of the existence of the meeting attendance provision and that his election protests to the local and international unions concerned matters wholly unrelated to the rule." 403 U.S. at 341, 91 S.Ct. at 1846.
 
 
 30
 We question whether the finding of the District Court on this issue does not in reality constitute a conclusion of law that every challenge by a union member to the application of a rule that makes him ineligible to run for office is also a challenge to the validity of that rule. This is essentially the position taken by the Secretary on appeal. We do not believe that the Supreme Court intended to establish this principle by its decisions in Laborers Union and Local 6799, and we decline to adopt such a per se rule. It is one thing to require a union, when faced with the protest of a member who lacks enough information to frame a comprehensive complaint, to "expand its inquiry beyond the specific challenge" and redress any grievance that the complaint could reasonably be construed to have asserted. Laborers Union, supra, 389 U.S. at 484, 88 S.Ct. at 643. But it is quite another to require a union to redress a grievance that its members explicitly did not assert, as here, simply because the Secretary believes that the members should have asserted it. In Local 6799 the Court observed that "the primary objective of the exhaustion requirement is to preserve the vitality of internal union mechanisms for resolving election disputes-mechanisms to decide complaints brought by members of the union themselves." 403 U.S. at 340, 91 S.Ct. at 1846. Morgan and Gianni knew of the meeting-attendance rule and knew that, because of the local's application of it to their circumstances, they were ineligible to run for office. They could easily have raised an objection to the rule's validity but chose not to. Instead, they asked the union to apply the rule differently. We do not see how the policy of fostering responsible union self-government is furthered by disregarding the familiar distinction in law between a challenge to a statute on its face and one to a statute as it is applied, see, e. g., Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953); Local 6799, supra, 403 U.S. at 335 n. 3, 91 S.Ct. 1841, and holding that the Secretary may litigate the validity of any rule under which a member is declared ineligible to run for office even though the member himself expresses no dissatisfaction with the rule.
 
 
 31
 We therefore hold that the District Court properly dismissed the allegations of the Secretary's complaint charging violations of section 401(e).[13] This makes it unnecessary for us to reach the question of the reasonableness of the meeting-attendance rule, and we decline appellees' invitation to render an advisory opinion on the subject. Our disposition of the section 401(e) claim also makes it unnecessary for us to reach the question whether the Secretary can litigate any issue that was exhausted internally even if that issue was not raised in the complaint to him, and we intimate no opinion on it.
 
 
 32
 Defendants have cross-appealed the District Court's ordering of a supervised election for treasurer. They assert that the section 401(c) violation was remedied by the special election held on April 18, 1968, and that LMRDA Sec. 402(b), 29 U.S.C. Sec. 482(b), bars the Secretary from including this issue in his suit. They argue that the Secretary's "precipitous" filing of suit, after he was notified of the union's intention to remedy the violation, frustrates achievement of the goals of placing upon the union the primary responsibility for enforcing compliance with the LMRDA and of amicably resolving election controversies. Further, the Secretary's action is said to frustrate the policy of fostering union self-government since the special election was a union remedy that "enhanced the members' faith in the protest procedure and union self-government" and "fulfilled the union's duty to enforce the Act."
 
 
 33
 The District Court relied primarily on the Supreme Court's decision in Wirtz v. Local 153, Glass Bottle Blowers Association of the United States and Canada, AFL-CIO, 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968) (Bottle Blowers). In that case, the Court reversed the Third Circuit's holding that the occurrence of an unsupervised election-the local's regular biennial election-following the election challenged by the Secretary mooted the Secretary's challenge to the prior election. Looking at the policy behind the LMRDA of insuring responsible and democratic administration of union affairs, the Court held that it would be
 
 
 34
 incorrect to read [the] provisions circumscribing the time and basis for the Secretary's intervention as somehow conditioning his right to relief once that intervention has been properly invoked. Such a construction would ignore the fact that Congress, although committed to minimal intervention, was obviously equally committed to making that intervention, once warranted, effective in carrying out the basic aim of Title IV.
 
 
 35
 389 U.S. at 473, 88 S.Ct. at 649. The Court indicated a concern also with the opportunity possessed by incumbent officers to exercise control over succeeding elections-the unfairness of the first election, the Court stated, could infect the remedial election conducted by the union. Moreover, the Court saw the statutory remedy of supervised elections as reflecting a congressional conclusion "that union members made aware of unlawful practices could not adequately protect their own interests through an unsupervised election." 389 U.S. at 474, 88 S.Ct. at 650.
 
 
 36
 Appellees attempt to distinguish the Bottle Blowers case by arguing that the asserted section 401(c) violation was not properly included in the Secretary's complaint in this case, that the special election was a "pre-complaint remedy" that precluded the Secretary from including the issue in his lawsuit. We disagree.
 
 
 37
 Initially, we observe that it is disingenuous at best for appellees to argue that the special election called by them represented an exercise of responsible union self-government. The Stevenson protests were denied by the local and the international, and it was not until after the Secretary's jurisdiction had been properly invoked and the defendants notified of his findings that the decision was made to reverse the initial conclusion and order the new election for treasurer and grievanceman. Thus, it appears that without the Secretary's intervention, the admitted violations would have gone uncorrected.
 
 
 38
 Further, the Court stressed in Bottle Blowers that the Secretary's right to relief, once his jurisdiction is properly invoked, cannot be limited or conditioned. We construe this to mean that the Secretary can determine for himself whether an alleged violation has been remedied. Presumably, for example, if a member is dissatisfied with a remedy proposed or implemented by his union, he can complain to the Secretary that a violation has occurred and has not been remedied. Section 402(b) provides that the Secretary shall investigate a complaint filed with him and shall file suit if he has probable cause to believe that a violation has occurred "and has not been remedied." Thus, the Secretary's jurisdiction, we believe, is not necessarily precluded by a union's implementation of a "remedy." It follows that the Secretary can file suit to set aside a challenged election whenever he believes that a violation has in fact not been remedied, whether the alleged remedy has already occurred or whether the Secretary merely has notice from the union that the remedy will occur.
 
 
 39
 It is true that in Bottle Blowers the election occurred after the Secretary's lawsuit was filed and no notice technically was given to the Secretary beforehand that the violation would thus be remedied (although presumably the Secretary was aware of the timing of the union's elections). We believe, however, that even if an election had occurred before the suit was filed, the Court would have reached the same result. In light of the Court's statement that "the intervention of an election in which the outcome might be as much a product of unlawful circumstances as the challenged election cannot bring the Secretary's action to a halt," 389 U.S. at 474-475, 88 S.Ct. at 650, we agree with the conclusion of the District Court in this case that
 
 
 40
 [t]he union cannot negate the secretary's power to supervise an election, once it has been shown that a violation of Sec. 401 has occurred and may have effected [sic] the outcome of the election, by conducting another un-supervised election.
 
 
 41
 Finally, the Secretary, as we have noted, is commanded by section 402(b) to file suit if a discovered violation "has not been remedied." In this case, when the Secretary filed suit, the violation was as yet uncorrected. Even assuming that the holding of an unsupervised election before the Secretary filed suit would constitute a sufficient remedy to deprive the Secretary of his power to act, still, no such election had been held in this case. The Secretary, by filing a complaint on the basis of a section 401(c) violation, was merely following the clear statutory language. Indeed, he was acting pursuant to statutory mandate. Notice that a violation will be remedied is not the equivalent of notice that it has been remedied.
 
 
 42
 We therefore hold that the District Court did not err in ordering a supervised election for the office of treasurer. However, we do not agree that the Secretary should be restricted to supervision of the balloting aspects of the election. Section 402(c) provides that if the court finds that the violation of section 401 may have affected the outcome of an election, the court shall declare the election void and "direct the conduct of a new election under supervision of the Secretary." The absence of case law on the question whether this can be interpreted by a trial court to mean "partial supervision" indicates that courts have assumed either that this provision authorizes supervision over all aspects of an election or, at least, that the question is committed to the Secretary's discretion.
 
 
 43
 We believe that it would be unwise to restrict the scope of the Secretary's supervision. If a violation occurred during the balloting phase of an election, the possibility increases that violations occurred during other phases, or would occur in subsequent elections in other phases. It would thus seem advisable to allow the Secretary to supervise the entire election if he deems it necessary. Not only would this afford maximum protection to the union members, but it would also avoid the multiplicity of litigation that could result from incumbent officers' violating a different provision of section 401 in each new election. Moreover, section 402(c) (2) commands courts to order a supervised election if it is determined that the violation of section 401 "may have affected the outcome" of an election. To allow courts to restrict the Secretary's supervision to those aspects of the new elections shown to have been affected by the violations could lead to courts' requiring the Secretary to specify and prove the effects on the election. This would impose a heavier burden than the LMRDA explicitly places upon the Secretary, and we decline to do so by extrapolation.
 
 
 44
 The judgment of the District Court is reversed insofar as it restricts the Secretary's supervision of the election for treasurer to the balloting aspect. In all other respects it is affirmed.
 
 
 
 [1]
 All 3700 Steelworkers locals conduct elections at the same time every three years
 
 
 [2]
 Section 401(e), 29 U.S.C. Sec. 481(e), provides in part:
 In any election . . . a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to . . . reasonable qualifications uniformly imposed)
 Section 402, 29 U.S.C. Sec. 482, authorizes the Secretary of Labor to file suit to remedy any violation of Sec. 401 if certain conditions have been met:
 (a) A member of a labor organization-
 (1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or
 (2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation,
 may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 481 of this title . . . .
 (b) The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization . . . to set aside the invalid election, if any, and to direct the conduct of an election . . . under the supervision of the Secretary . . . .
 (c) If, upon a preponderance of the evidence after a trial upon the merits, the court finds-
 (2) that the violation of section 481 of this title may have affected the outcome of an election,
 the court shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary . . . .
 
 
 [3]
 The seven other cases are: Shultz v. Local 6799, Steelworkers, 60 CCH Lab. Cas. p 10,261 (C.D.Cal.), aff'd, 426 F.2d 969 (9th Cir. 1970), aff'd sub nom. Hodgson v. Local 6799, Steelworkers, 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971); Shultz v. Local 1150, Steelworkers, 64 CCH Lab. Cas. p 11,288 (S.D.Ind.1970), appeal pending No.______ (7th Cir.); Wirtz v. Local 2173, Steelworkers, No. 68-76 (S.D.Ohio); Wirtz v. Local 5724, Steelworkers, No. 68-30 (S.D.Ohio); Wirtz v. Local 1219, Steelworkers, No. 68-1425 (W.D.Pa.); Wirtz v. Local 1578, Steelworkers, No. 68-1421 (W.D.Pa.); Wirtz v. Local 1798, Steelworkers, No. C-48751 (N.D.Cal.). Only the first two of these have been tried, and we are informed by appellees that the appeal in Local 1150 was abandoned by the Secretary in light of the Supreme Court's decision in Local 6799. Of the other five, Local 1798 became moot and was dismissed, and the remaining four, we are told, likely will be withdrawn because of Local 6799
 The Secretary instituted another round of lawsuits attacking the meeting-attendance rule following the 1970 elections. None of these cases has been tried, and appellees assert that Local 6799 will preclude trial of most, if not all, of them.
 
 
 [4]
 For the first 13 months of the threeyear period preceding the elections, the local was under an administratorship, and regular meetings were not conducted during that time. The election committee decided to exclude that period and the meetings held therein from computation under the meeting-attendance rule
 
 
 [5]
 Morgan's letter of protest to the local reads as follows:
 Allen Park, Mich.
 Subject: Protest and Request for an Election in Div. #1
 Copy to;
 Mr. Charles Younglove (District Director 29)
 Local 1299 Recording Secretary and Members
 Dear Sir's and Sister's
 I Robert Morgan member in good standing of our great organization believe I have been unjustly dealt with via my Local Union Officers. My protest could have been avoided had the officers heeded constructive advice on the reading and language of our Constitution and By-Law's, Re: Fer, article #4 Sec. 6, Para: C. Also they failed to properly notify me that My name was not going to be on the election ballot therefore causing an expense and humiliation among my fellow Union brothers and sisters. I questioned our Local President on Fri. June 23, about the hear say of my not being afforded my rights as a member in good standing and he felt that the officers as well as himself were right in doing what they did so I ask him for his permission to go to my International Union for further advice He gave his permission and I went to my International Union and was instructed what my rights are.
 My allegations are that some of my local officers are Prostituting the membership thru their dictatorial persuasions and reluctance to use the Constitution and By-Laws at their fullest meaning therefore giving themselves the benefit of any doubt on their part in the final voting of our election June 28.
 I will apologize if I have unjustly hurt anyone thru my attempt to give my International and my Local Union the Leadership it so richly deserves. Having been given permission via Local President to seek justice with out provocation I ask my International Union to render a decision upon their finding and the proof that I have available for them that a new election may soon come about and that all our great leaders in our ranks may have equal opportunity to express their skills in an un-biased election.
 To the membership I trust you will be at odds with anyone or a group who dictate the rules of the game because when you give up the God given right to question or when you give up the American way of getting things done in an American way you are sacrificing the principles on which this great country was built on therefore please bear with me and for me in my Protest and Request to our great International Union that they will be just in their findings and decision.
 Your's for Good Leadership
 Robert A. Morgan
 P.S.
 Reply Requested
 Gianni's letter was almost identical.
 
 
 [6]
 See note 4 supra
 
 
 [7]
 Gianni's testimony on recross examination was quite clear on this point:
 BY MR. FRANKEL:
 Q. Mr. Gianni, just so I understand how you were arguing that your period, while you were under administratorship,-as I understand it, you were arguing that the Bylaws should be applied and there should be eighteen or fifty percent out of the thirty-six months?
 A. I simply read the Bylaws, sir, and it says eighteen of thirty-six meetings.
 Q. That is what you were trying to apply?
 A. That's all I was applying.
 Q. So that as I understand it, you were treating that year period, '64 to '65, you wanted that tacked onto the twenty-three meetings which the Election Committee used?
 A. Yes.
 Q. And you wanted credit for the entire year; is that right?
 A. I felt that I was entitled to it.
 Q. Okay. These twelve meetings?
 A. I don't know whether it was twelve meetings or not. I'm not sure how many meetings they had, but whatever the amount was-
 Q. You wanted that year computed in?
 A. Yes, I felt I was entitled to it.
 Morgan testified on direct examination that he wanted only "to go by the By-laws."
 
 
 [8]
 In his internal protest letter, Hantzis appended a postscript: "Enclosed and attached copy of letter to I. W. Abel, President which I have never discovered or been informed if an answer was received or not." The letter to President Abel read as follows:
 
 
 [103]
 1/2 East Holt Blvd
 
 
 [10]
 May 1967
 Ontario, Calif. 91761
 I. W. Abel, President
 United Steelworkers of America
 1500 Commonwealth Building
 Pittsburgh, Pa.
 Brother Abel.
 Enclosed copy your wire to Frank S. McKee, Representative, Sub-District # 2, District # 38, dated May 9, 1967 necessitates this challenge of the validity of the information on which you must have based this decision to count Regular Meetings beginning in August, 1965:
 Point # 1:
 The placing of the members of this LU in good standing thru utilization of Article XI, Section 8 of the Constitution in 1965 enabled the membership to vote in the election of our present Officers, including myself.
 Point # 2:
 Being duly qualified Officers, we did hold Regular Meetings in both June and July, 1965 altho our agreement was not executed until July 16th, 1965, and the members of this LU did both attend these meetings and make, second and pass motions.
 Point # 3:
 The above facts being recorded in our Minutes, showing the members who signed the Attendance Register to be in good standing at these meetings, must then necessarily indicate that these members may legally count this attendance towards any and all eligibility requirements for our coming elections to be held on June 12, 1967!
 Point # 4:
 Since our greatest attendance was at these two meetings failure to allow this attendance count will deprive all members, except we Officers who have been in regular attendance, of the qualifying attendance for four meetings towards eligibility!
 Point # 5:
 The major consideration is, that, by not counting these two meetings, we are opening to challengable doubt the legal validity of our original election and the ensuing two years of administration of the affairs of this Local Union.
 NOTE:
 I have written this as an individual member of the United Steelworkers of America, and not in my official capacity as an Officer, the Recording Secretary, of this Local Union # 6799. Therefore, I will appreciate your answer being sent to this Local Union and our Staff Representative, Frank S. McKee, District # 38.
 
 
 [9]
 The complaint read in part:
 "(3) Eligibility Requirements were too strict, in that only 10% to 15% of the total membership could possibly have been eligible as candidates-this created an unfair advantage favoring existing Officers and Grievancemen (who naturally were in fairly regular attendance) by the failure of this Local Union to distribute and the International Union to require distribution of our Constitution and By-Laws and our Local Union Election Manual. Despite numerous requests by members, at least 95% of the Local Union Members had never received copies of these or full information concerning these documents! . . .
 "Also, in establishing eligibility Pres. Ken Rose and our Staff Representative Frank McKee requested from International-President I. W. Abel that we start counting Attendance in August, 1965. This, I challenged by, twice, writing to International President I. W. Abel on the grounds that our members had been in good-standing when we held our initial Election so how could they legally be deprived of this attendance two years later? . . ."
 
 
 [10]
 See note 5 supra
 
 
 [11]
 See note 7 supra
 
 
 [12]
 See note 8 supra
 
 
 [13]
 The Secretary has not urged on appeal that the rule was improperly applied, which was the issue raised and exhausted by Morgan and Gianni. The District Court, as noted previously, found that the rule had been "uniformly imposed" and, thus, properly applied. The evidence clearly was sufficient to support this finding