Peter J. BRENNAN, Secretary of Labor, United States Department of Labor and Angelo J. Cefalo, Appellants,

v.

INTERNATIONAL UNION OF DISTRICT 50, ALLIED AND TECHNICAL WORKERS OF the UNITED STATES AND CANADA.

Angelo J. CEFALO et al., Appellants,

v.

Elwood MOFFETT et al.

Angelo J. CEFALO, Individually and on behalf of the International Union of District 50, Allied & Technical Workers and its members, et al., Appellants,

v.

Elwood MOFFETT, Individually and as International President of District 50, Allied & Technical Workers, et al.

Nos. 72-1494, 72-1495 and 72-2082.

United States Court of Appeals, District of Columbia Circuit.

Argued June 1, 1973.

Decided June 3, 1974.

Earl C. Dudley, Jr., Washington, D.C., with whom David N. Webster, Washington, D.C., was on the brief, for appellants. Paul Martin Wolff, Washington, D.C. also entered an appearance for appellants.

Winthrop A. Jones, Washington, D.C., with whom Joseph C. Wells and George H. Cohen, Washington, D.C., were on the brief, for appellee International Union of Dist. 50.

Michael Kimmel, Atty., Dept. of Justice, for appellee Brennan in Nos. 72–1494 and 72–1495. Harold H. Titus, Jr., U. S. Atty., Morton Hollander and Michael H. Stein, Attys., Dept. of Justice, were on the brief, for appellee Brennan in Nos. 72–1494 and 72–1495. Raymond D. Battocchi, Atty., Dept. of Justice, also entered an appearance for appellee Brennan in No. 72–1494.

Harold H. Titus, Jr., U. S. Atty., Walter H. Fleischer and Michael H. Stein, Attys., Dept. of Justice, filed a brief on behalf of the Secretary of Labor as amicus curiae in No. 72–2082.

Ross O'Donoghue, Washington, D.C., entered an appearance for appellee Moffett in No. 72–1495.

Before DANAHER, Senior Circuit Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

These consolidated cases present appeals from rulings of the District Court in actions under the Labor-Management Reporting and Disclosure Act of 1959 (hereafter LMRDA or the Act) 29 U.S. C. § 481 et seq. The combined judgments, for which no stay was sought, permitted effectuation of a merger between District 50, Allied & Technical Workers,[1] and the Steelworkers.[2] The appellants, Angelo Cefalo and Samuel Vullo, who were candidates to become principal officers in District 50, contend that the merger, approved by a referendum of the membership of District 50, should be enjoined because it was negotiated by officers who had been elected in violation of Title IV of the Act, and, accordingly, that a new election of officers pursuant to Title IV was required as a matter of law prior to consideration by the membership of the

1. When the litigation began, the union was District 50, United Mine Workers of America, but the name was changed in April, 1970, after a break with the Mine Workers.

2. United Steelworkers of America, AFL–CIO.

merger. They also contend that the referendum, conducted under the supervision of the Secretary of Labor, was marred by irregularities. We affirm.

## I. FACTUAL BACKGROUND AND DISTRICT COURT PROCEEDINGS

The factual and procedural background is complex, and our presentation necessarily somewhat simplified.

### A. *The Title IV Action*

After the May 1970 referendum election of union officers in which defendant Elwood Moffett was reelected as president of District 50, the defeated Cefalo filed a complaint with the Secretary of Labor under § 402 of LMRDA.[3] The Secretary found cause to believe the elections of the union officers and of the executive board had been conducted in violation of § 401 of the Act.[4] In September 1970 the Secretary began an action (Civil Action 2864–70) against District 50, pursuant to Title IV of the Act, to set aside the elections. In March, 1971, a court order approved a stipulation between the Secretary and District 50 which provided that the Secretary would supervise (1) nomination and election of local delegates from the union's locals to a new convention, (2) nomination and election of the executive board at this convention, to be held in August 1971, and (3) after the convention, nomination and secret ballot election of principal officers. The election of executive board members was certified by the Secretary as conforming to

Title IV of the Act. On March 13, 1972, the District Court granted Cefalo's petition, filed in October 1971, to intervene.[5] On March 14, the District Court approved the results of the executive board election.

### B. *The Title V Action*

Beginning in April, 1971, an attempt was made by the union officers to have the August 1971 convention approve a proposed merger with the Steelworkers, even though the proposal was not disclosed in the call to the convention and indeed was not revealed until most of the convention delegates had been chosen.[6]

In July 1971 Cefalo and Vullo began an action (Civil 1328–71) under Title V of LMRDA, against Moffett and District 50, and on August 18, the District Court issued a preliminary injunction, concluding that plaintiffs would probably prevail on the merits in showing that the union officers breached their fiduciary duty of trust and fair dealing established by § 501 of LMRDA, by failing to inform the union membership of the impending merger prior to selection of convention delegates, and by seeking approval of the merger by various locals' resolutions without revealing the pecuniary benefit the officers and staff of District 50 stood to gain from the merger.

The preliminary injunction of August 18 enjoined defendants from presenting, voting upon or effectuating the merger. On August 23, following an expedited hearing, this court modified the injunc-

---

3. 29 U.S.C. § 482.

4. 29 U.S.C. § 481.

5. Leave to intervene was first denied, on the authority of Hodgson v. UMWA, 72 LRRM 2496 (D.C.Cir. 1971), which affirmed the denial of intervention on the basis of the District Court's opinion in Hodgson v. UMW, 51 FRD 270 (D.D.C.1970). Reconsideration was granted after that ruling was reversed in Trbovich v. UMWA, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972).

6. Merger negotiations between District 50 and the Steelworkers had begun in 1968, but

were broken off after an $8 million judgment had been obtained against District 50 by its former parent, the United Mine Workers. Merger negotiations resumed in 1970 after this court reversed that judgment, International Union, UMWA v. District 50, UMWA, 140 U.S.App.D.C. 349, 435 F.2d 421 (1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1372, 28 L.Ed.2d 645 (1971). A proposed merger agreement was reached in principle in January, 1971, and executed April 24, 1971.

tion to permit the August 1971 convention, then in session, to authorize the executive board elected at the convention to adopt a plan, subject to court approval, for holding a referendum of the membership of District 50 on the merger. Cefalo v. Moffett, 146 U.S.App.D.C. 117, 449 F.2d 1193 (1971). Our opinion and order emphasized the latitude of the District Court to specify procedures appropriate in achievement of the objective of a "free and informed vote of the Union's membership, not subject to undue influence." 146 U.S.App.D.C. at 123, 449 F.2d at 1199. We directed the District Court to seek the comments of the Secretary "in considering whether or on what terms and conditions to approve a plan for referendum on the merger." 146 U.S.App.D.C. at 124–125, 449 F.2d at 1200–01. The opinion noted that the Act placed exclusive enforcement authority in the Secretary to redress violations of Title IV rights, see Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 389 U.S. 463, 473, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968) and commented that on reflection the Secretary might conclude that the merger and referendum should be halted in order to preserve and vindicate Title IV rights to proper election of officers.

C. *The Decision to Proceed with the Merger Referendum Without Awaiting The Election of New Officers.*

On September 20, 1971, District 50 presented, by a motion filed in the Title V action, a plan for a merger referendum which had been developed with participation of the Steelworkers' lawyers and had gained the approval of the Department of Labor. Plaintiffs, objecting to the referendum plan, took several depositions, including particularly that of Acting Solicitor of Labor Alfred Albert. Various motions were filed, by plaintiffs to defer the referendum, and by the unions to expedite it. At a hear-

ing in December the Department's counsel advised that the Department favored deferring the election of the officers until after the merger referendum.[7] The District Court requested a written statement from the Secretary of Labor setting forth his position on the issue of the timing of the referendum and election of officers. The Secretary's memorandum filed January 3, 1972, outlined his view that a referendum on the merger vote should not be delayed until after a new election of officers.

On February 23, 1972, District Judge Parker issued an opinion and order in the Title V action which held that the membership of District 50 should proceed to vote for the approval or disapproval of the merger, and which approved "in principle" the referendum plan submitted by District 50, endorsed by the Secretary. The court held plaintiffs were entitled to "adequate and equal opportunity to express their opposition to the merger," and to submit counter-proposals, and ordered plaintiffs to submit such proposals as they contemplated would afford this opportunity. In their memorandum filed March 8, plaintiffs objected to any merger vote that preceded the election of new officers. On April 3, 1972, the District Court overruled plaintiffs' objections, and directed that a referendum vote be held no later than June 10, 1972, under the supervision of the Secretary (although he was not a party to the Title V action). The court ordered publication of a special supplement of at least six pages of the *District 50 News* with equal space for proponents and opponents of the merger. The order in the Title V action, directing that the referendum be held according to the approved plan, issued April 14, 1972, and is appealed in No. 72–1495.

The same issue was presented by Cefalo as intervenor in the Title IV action

7. Counsel stated (Tr. 23 Dec. 1971, p. 16) that the Department's settled position is not to interfere with a union's merger where the Department has no evidence that its purpose is to avoid a new election under the Secretary's supervision, as provided in Title IV. This position is consistent with that stated by Acting Solicitor Albert at his deposition.

when he moved on March 21, 1972, for an order directing immediate election of officers, prior to the merger referendum.[8] The denial of this motion by Judge Parker on April 3, 1972,[9] is the order appealed in No. 72–1494.

### D.  *Approval of the Merger*

While the foregoing appeals were pending, the merger referendum was held, pursuant to the order in the Title V action. The merger was approved by a vote of 37,289 to 26,733. On June 30, 1972, after investigating complaints by the Cefalo group, the Secretary certified the results. On August 8, the District Court approved the merger by an order that is appealed in No. 72–2082. Plaintiffs' challenge is based on (a) a claim of inaccuracies in the mailing list, which the Secretary investigated and found that such inaccuracies as could be demonstrated were unavoidable; and (b) a claim that pro-merger campaign contributions were coerced, which the Secretary held was unfounded.

## II.  THE ISSUES

### A.  *The Contention That The Orders Of The District Court Constitute A Stay*

The plaintiffs contend that the District Court's April 1972 orders deferring election of officers pending the referendum on the merger were, in substance, a stay of an order directing a new election of officers, a stay forbidden by § 402 of LMRDA, 29 U.S.C. § 482.

Section 402 expresses a Congressional policy of expedition in the handling of complaints alleging violations of § 401, which governs the conduct of elections. A union must process within three months a member's complaint of a § 401 violation, see § 402(a)(2). An aggrieved member must file a complaint with the Secretary within one month after exhaustion of union remedies, and the Secretary must bring any lawsuit to set aside an election within 60 days thereafter, see § 402(b). If in such a suit the court finds that a violation of § 401 may have affected the outcome of an election, § 402(c) provides that the court shall direct the conduct of a new election under the supervision of the Secretary, and that the Secretary shall promptly certify to the court the names of the persons elected. Section 402(d) provides that an order directing a new election shall not be stayed pending appeal.

The District Court's actions did not violate the provisions of § 402. The stipulation for an election filed in Secretary's Title IV action expressly provided it was not an admission by defendants of a violation of § 401. Nor was the court's order providing for an election a finding of a § 401 violation, either expressly or by necessary implication. The order of the District Court approving a merger referendum prior to an election of officers did not amount to a "stay pending appeal" within the meaning of § 402(d).

However, the District Court's orders did operate to delay the date of election of union officers, and we think it appropriate to go beyond our ruling that there was no transgression of § 402 and to consider the larger questions raised by appellants: whether in this case the District Court's actions are contrary to the spirit of the Act, or whether there is any other basis for concluding that judgment below reflects abuse of discretion.

### B.  *Approval of the Merger Referendum Prior to a New Election of Union Officers*

In its opinion of February 23, 1972, in the Title V action, the District Court determined, after review of the

---

8. This action occurred within a week after the District Court order of March 15, 1972, declaring the persons named in the Secretary's certification were the duly elected officers of the executive board.

9. The Title IV case was transferred to Judge Parker from Judge Bryant on October 28, 1971.

memoranda of the parties and the submissions of the Secretary, to proceed with the union merger referendum and declined to stay that referendum pending disposition of the Title IV action on the merits.[10] In our 1971 opinion we directed the District Court to ascertain the views of the Secretary.[11] We referred to the Secretary's exclusive role in determining whether to seek judicial relief under Title IV. The Secretary's distinctive discretion to decide whether to bring a Title IV action does not, of course, give him exclusive power to direct the future course of an action brought.[12] But although not decisive, the Secretary's voice, informed by his familiarity with the matters pertaining to union elections and the vindication of Labor's Bill of Rights, is rightly accorded weight by the court.

In rejecting the view that a new election of officers should precede the merger referendum, the Secretary urged, and the District Court found, that by the summer of 1971 what was nominally a contest between contenders for union office, a contest that typically stresses the policies proposed by the campaigners for on-going execution by the union, had become primarily a question of merger with the Steelworkers.

The Secretary's memorandum develops this matter (pp. 9–10):

> The primary question concerning the union [District 50] at this point is whether it should maintain its separate existence or whether it should merge and become a part of the United Steelworkers Union. The rank and file membership is now squarely between two competing factions within the union, each of which apparently has commitments to a union other than District 50. Even if an election of officers were conducted either prior to or simultaneously with the referendum, the principal issue in the campaign would still be the proposed merger with the Steelworkers. This question should be decided at the earliest possible time. To defer that question for the approximately five months required to conduct nominations of officers under District 50's Constitution would further confuse the membership with regard to their standing in District 50 and quite possibly lead to its breaking up as an effective force within the labor movement.

> Although various possibilities may be hypothesized, as a realistic and practical matter a vote on the question of merger will determine whether the membership wishes to change officers. A vote for the merger will demonstrate both support for the incumbent officers and a desire to become a part of the Steelworkers. A vote against the merger will be a rejection of the incumbents and indicate that the membership wishes District 50 either to remain independent, become part of the Machinists or affiliate with some other organization. The latter event will necessitate a new election of officers under the supervision of the Secretary.

The Secretary's reference to the Machinists raises the point that an element in the decision whether to merge with the Steelworkers lay in the alternative whether to become part of the Machinists. In a critical paragraph, No. 9, in its August 1971 findings the District Court stated:

> Since shortly after his loss of the May 1970 election Mr. Cefalo has been employed as an assistant to the President of the International Association of Machinists and Aerospace Workers,

---

10. This determination was later adopted in the rulings in the Title IV action.

11. Cefalo v. Moffett, *supra*, 146 U.S.App.D. C. at 124–125, 449 F.2d at 1200–1201 (1971).

12. Other parties may intervene and present an approach divergent from the Secretary's.

Trbovich v. UMWA, *supra* note 5. Even without such intervention, the court is not bound to follow the Secretary's approach. *Compare* SEC v. Jones, 298 U.S. 1, 80 L.Ed. 1015 (1935).

AFL–CIO, which is actively and successfully raiding the membership of District 50.

The Secretary also urged the court to reject any plan of combining the election of officers with the vote on the merger (memorandum at 10–11):

> Although at first blush the question of combining the election of officers with the vote on the question of merger seemed preferable to having the election of officers first, upon more thoughtful consideration it appears that a combined election would be less desirable. In a combined election, the individual member would have to decide simultaneously whether to ratify the merger agreement and who should be the principal officers of District 50 in the event that the merger agreement fails of ratification. Each of these decisions will rest upon different considerations, and they should be made independently of each other. A union member who may desire to vote for a candidate for office other than an incumbent might also desire to vote in favor of the merger. If he exercised his right to vote for the candidate of his choice, a majority of votes cast for the merger would nullify his choice for a union officer, since the merger becomes effective immediately upon its approval by the membership.

> In addition to the foregoing, some of the same objections raised with respect to holding the election of officers first apply. Thus, to hold a combined election would defer decision on the merger for about five months and would entail considerably greater expense for the union and the Secretary than an immediate mail referendum on the merger alone.

■ We find these considerations to be persuasive, and to justify both the decision to proceed with the merger referendum and to defer the determination of the Title IV action pending that merger referendum vote. In our 1971

opinion modifying the preliminary injunction, we stressed that any merger referendum be safeguarded by provisions for "a properly conducted referendum vote" to protect the need for an informed debate on the merger by the union membership.

We are not oblivious to the difficulties that are presented when a union is called on to decide a matter of such moment as a merger on a proposal submitted by officers whose position is in any degree suspect. Where an election has been challenged and Title IV rights have not been fully vindicated by the conduct of a supervised election of officers, there is the risk that union business conducted in the interim may lack the full legitimacy of a union electoral process. This consideration, while material, is not dispositive of the issue here. While the Secretary might conclude that such matters as a merger ought always to be deferred until completion of a supervised election, we cannot say that the statute requires such an absolute rule. Here there were considerations militating against further delay. There was a compelling need for the members to express their views on the issue of merger with the Steelworkers. To have withheld an opportunity for them to do so until completion of a new election of officers was to have risked costly postponement of the membership's opportunity to choose an effective bargaining representative, a risk augmented by the "raiding" by the Machinists referred to in the District Court's paragraph 9 finding.

The Secretary was of the view that the merger referendum was the immediate essential vehicle for allowing members to determine the future course of their union, the broad objective sought by Congress in passing the Act. Safeguarding the integrity of the referendum process was the intervening selection of an executive board in an election supervised by the Secretary,[13] and the

---

13. We are aware of expressions in Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968), cautioning against the rectification

Secretary's supervision of the referendum itself. The District Court sought additional protection by guaranteeing appellants' dissemination of their views opposing the merger.

In our view, these considerations justify both the recommendation of the Secretary and the ruling of the District Court. Neither the executive official nor the judge was bound to forsake a course that in both method and objective reflected the ultimate principle of union democracy.

We thus uphold the District Court's ruling, and the Secretary's position, in this case without approving the more general statements of the position of the Department of Labor on remedying Title IV violations to which appellants object. Solicitor Albert's statement [14] that the Department will not intervene with respect to a merger unless it is a device to evade a court-ordered election under § 402 may reflect too narrow a view of the Department's role. Similarly, in making a determination as to a purpose of evasion on the part of present District 50 officers, the Department's views may attribute too much weight to the fact that merger discussions with the Steelworkers began before a new election was ordered in the Title IV action. We focus on what we regard as the critical finding of the Department, stated by Acting Solicitor Albert in deposition and asserted in the Secretary's January, 1972, memorandum, that the merger referendum was the appropriate vehicle for resolving the then most crucial issues concerning the union's future. The question for us is whether, in this context, the District Court exceeded its lawful

powers or abused its discretion. We hold that it did not.

C. *The Conduct of the Merger Referendum*

Appellants' challenge to the order approving the referendum is, in effect, an attack upon the Secretary's procedures in establishing and supervising the referendum, and upon his investigation of complaints of alleged irregularities. Because of the unusual nature of the Title V violation, the Secretary was called upon to perform a supervisory function similar to those he performs in Title IV election cases.

1. *The mail referendum.*

The court approved a mail referendum. Appellants say there were inaccuracies in the mailing list. It is plain that the Secretary took extraordinary care to assure that the mailing list used as the basis of the referendum would be as accurate as possible.[15] Also, the District Court required that notice of the referendum, and the special edition of the *District 50 News*, be posted "where notices to members customarily are posted."

Some members did not receive ballots, and appellants say these might number "several thousand." But the union had more than 165,000 members, and the margin of victory was more than 10,500 votes (37,289 to 26,733). There were also 3,151 ballots received too late to be counted, but this number was not shown to be due to any defect in the mailing list.

■■ Though appellants criticize the mailing—they refer to 4,299 mailings

---

of violations of § 401 by reference to a supervening election. That decision, however, was one which upheld the right of the Secretary to seek a new election notwithstanding an intervening *unsupervised* election. In the present case, by contrast, the Secretary recommended deferral of the election of officers to permit a supervised referendum on the merger, having supervised the election of the executive Board that proposed the merger referendum.

14. Transcript of deposition, p. 50.

15. The mailing list was based primarily on employers' check-off lists, estimated to account for 95% of the working members of the union. A supplement was prepared by local and regional union officials. The list was continually updated. There were more than 8,000 additions and deletions between the mailing of the special editions of the *District 50 News* and the mailing of the ballots.

never received, and hypothesize that "possibly thousands" were omitted from the list—they offer no suggestions for procedures to improve the conduct of a mailing of this magnitude. Instead, they proposed in person balloting through the locals. Our 1971 opinion indicated that this procedure might be prescribed, but was not mandatory.[16] We think the District Court was well within its discretion in rejecting the suggestion for separate elections in nearly 1,400 locals throughout the United States and Canada—each having its own potential for mistakes, inaccuracies and irregularities—and its attendant additional costs, both for campaigning and for Labor Department supervision. The District Court had before it the testimony of Acting Solicitor Albert, reflecting the experience of the Labor Department in supervising referendum votes, that "experience there is clear . . . by mail ballot you get wider participation." [17] There was no testimony to the contrary. The turnout rate was about 40% for American members of District 50, and 25% for Canadian members. We are not apprised as to whether these rates differ from participation rates expected in this kind of balloting. No basis other than complete speculation would have permitted the District Court to conclude, or would now permit this court to surmise, that a greater voter response would have resulted from local balloting. Account must be taken of the eligibility of retired and unemployed voters, who would not be expected to appear at polls located at job sites. In a Title IV lawsuit, a violation of § 401

makes a prima facie case that the violation may have affected the outcome of an unsupervised election. Wirtz v. Hotel Employees Local 6, 391 U.S. 492, 505–509, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968). Here, however, the Secretary's supervision of the referendum establishes a presumption of fairness and regularity that is not upset by appellant's showing.

### 2. Pro-Merger Fund.

■ Appellants also stress that most union staff members contributed between $50 and $100 to a pro-merger campaign fund. The Secretary found that these contributions were not coerced by union officers. This finding is not implausible, especially in view of the fact that the staff personnel hoped for substantial personal benefits from the merger, as we noted in our prior opinion.[18] That fact was duly disclosed to the union membership and indeed emphasized by those opposing the merger.

A suggestion that appeals to self interest must be distinguished from an act of coercion. The Secretary found that while the example set by certain staff members contributing may have generated a social pressure for their colleagues, the union officers themselves were aware of the litigation and carefully avoided any compulsion.[19] The one specific complaint by a union staff member in Providence that he was forced to make a contribution was investigated by the Secretary, who concluded that the charge was unfounded. These findings

16. Cefalo v. Moffett, *supra*, 146 U.S.App.D. C. at 123, 449 F.2d at 1199.

17. Transcript of Deposition, p. 71 (JA 126).

18. Cefalo v. Moffett, *supra*, 146 U.S.App.D. C. at 122, 449 F.2d at 1198.

19. Plaintiffs cite Hodgson v. United Mine Workers, 344 F.Supp. 17 (D.D.C.1972). The factual situation there was quite different. The District Court found that union staff members made campaign contributions ($500 to $1,000) substantially equal to pay raises received at the same time or shortly

thereafter, and that there were no alternative explanations for the timing of the salary increases, other than their manipulation to influence the election. 344 F.Supp. at 25. In the case at bar, the District Court found that the pay raise was granted in August, 1971, to bring field staff salaries more in line with salaries paid similar field staff by both the Machinists and Steelworkers, and the amount of the increase ($1,000 minimum) far exceeded the contributions (between $50 and $100) made in the spring of 1972.

are supported by the evidence, and we · think the District Court exercised sound discretion in dismissing appellant's objection to the election results.

Affirmed.