**UNITED STATES of America, Plaintiffs,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Defendants.**

**No. 88 CIV. 4486(DNE).**

United States District Court,
S.D. New York.

Nov. 13, 1997.

## OPINION & ORDER

EDELSTEIN, District Judge.

### BACKGROUND

This opinion emanates from the voluntary settlement of an action commenced by the United States of America against, *inter alia,* the International Brotherhood of Teamsters ("IBT" or "the Union") and the IBT's General Executive Board. The settlement is embodied in the voluntary consent order entered March 14, 1989 ("Consent Decree"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through a two-phased implementation of the Consent Decree's various remedial provisions. In the first phase of the Consent Decree, these provisions provided for three court-appointed officers: the Independent Administrator to oversee the Consent Decree's provisions; the Investigations Officer to bring charges against corrupt IBT members; and the Election Officer to supervise the electoral process that led up to and including the 1991 election for IBT International Union Office. In the second phase of the Consent Decree, the Independent Administrator was replaced by a three-member Independent Review Board, but the position of Election Officer remained unchanged. Further, paragraph 12(D)(ix) of the Consent Decree provides that "the union defendants consent to the Election Officer, at Government expense, to supervise the 1996 IBT Elections."

According to the original terms of the Consent Decree, the Election Officer was authorized to oversee only those matters and disputes concerning the 1991 IBT Election. Consent Decree, ¶¶ 3(1), 12(D)(ix). By Stipulation and Order dated February 7, 1995, however, the Consent Decree was amended to reflect the parties' agreement regarding the supervision of the 1995–1996 IBT International Union Delegate and Officer Election ("the 1996 Election"). *See* Stipulation & Order Implementing Paragraph 12(D)(IX) of the March 19[sic], 1989 Consent Decree (S.D.N.Y. Feb. 7, 1995) ("the February 7, 1995 Order"). The February 7, 1995 Order states that "it is the intention of the Government and the IBT that the Election Officer function in 1996 as similarly as possible to the 1991 Election Officer," *id.* at 2, and grants the 1996 Election Officer ("the Election Officer") "all rights and duties conferred upon the 1991 Election Officer by paragraph 12 of the Consent Decree," *id.* ¶ 1, including "the authority granted by Paragraph 12(I) of the Consent Decree to make applications to the Court, after giving notice to specified parties." *Id.* ¶ 3(c). Furthermore, the February 7, 1995 Order provides for the appointment of an Election Appeals Master to hear disputes about the conduct of the 1995–96 IBT election or the results of that election. *Id.* at ¶ 2.

Pursuant to her authority under the Consent Decree and the February 7, 1995 Order, the Election Officer submitted for this Court's approval the rules for the 1995–1996 IBT International Union Delegate and Officer Election ("the 1996 Election Rules"). On August 22, 1995, this Court approved the 1996 Election Rules in their entirety. August 22, 1995 Opinion & Order, 896 F.Supp. 1349, 1353 (S.D.N.Y.1995), *aff'd as modified, United States v. International Bhd. of Teamsters,* 86 F.3d 271 (2d Cir.1996). On appeal, the Second Circuit affirmed this Court, but held that one provision of the 1996 Election Rules was overly broad, and remanded the issue to this Court to amend the provision in question. *United States v. International Bhd. of Teamsters,* 86 F.3d 271 (2d Cir.1996).

This Court modified the rule in accordance with the Second Circuit's opinion. June 18, 1996 Opinion & Order, 928 F.Supp. 392 (S.D.N.Y.1996).

### FACTS

The ballot count for the 1996 IBT Election concluded on February 27, 1997. *See* Declaration of Barbara Zack Quindel, dated August 21, 1997 ("Quindel decl.") at ¶ 4. Following the Election Officer's announcements of the winning candidates, post-election protests were filed. Quindel decl. ¶ 4. The Election Officer conducted an investigation of the post-election protests and uncovered serious violations of the 1996 Election Rules.[1]

Under the Consent Decree, "the Election Officer is vested with broad authority to supervise each and every facet of the 1996 IBT election." October 29, 1996, Opinion & Order, 943 F.Supp. 360, 364 (S.D.N.Y.1996); *accord* July 10, 1990, Opinion & Order, 742 F.Supp. 94, 106 (S.D.N.Y.1990), *aff'd as modified,* 931 F.2d 177 (2d Cir.1991). The 1996 Election Rules specifically contemplate the possibility that the Election Officer will order a rerun election. The Rules state that "[s]hould the Election Officer refuse to certify any election, she shall then immediately order that a rerun election be held." 1996 Election Rules, Article XIV, Section 5.

On August 21, 1997, the Election Officer granted certain post-election protests, finding that violations of the 1996 Election Rules "may have affected the outcome of the election." Quindel decl. ¶ 5; *see* 1996 Election Rules, Article XIV, Section 3(b) (stating that the Election Officer cannot grant a post-election protest unless "the alleged violation may have affected the outcome of the election"). In her decision dated August 21, 1997 ("E.O. Decision"), the Election Officer found that in September 1996, Ron Carey ("Carey")

Campaign operatives met and concluded that the race was close and that the James Hoffa ("Hoffa") Campaign was raising between four and five times what the Carey Campaign was raising. E.O. Decision at 68. The Carey Campaign operatives determined that Carey would lose without additional money, and that the race was winnable but not unless the right people voted. *Id.*

Thus, in October 1996, Carey Campaign operatives implemented a scheme whereby IBT general treasury funds would be disbursed to certain political organizations upon the understanding that those organizations would make payments to the Carey campaign, *Id.* at 69–71. Carey personally authorized certain of these disbursements from IBT general treasury funds. *Id.* at 72–75. The Election Officer further found that in October and November 1996, other improper or illegal contributions in substantial amounts were made to the Carey Campaign. *Id.* at 75–78.

In addition, the Election Officer determined that a "large, direct mail campaign" was a key part of the "final efforts" of the Carey Campaign, and that during the week prior to the end of the voting period, between November 4 and November 9, 1996, the Carey Campaign mailed 1,697,214 pieces of campaign literature. *Id.* at 78–79. The campaign targeted the mailings so that members in certain groups would receive anywhere from one to five pieces of mail over the course of a week, *id.* at 79, and the contributions that supported the mailings, were "the product of employer solicitations and/or employer-created schemes to inject employer and IBT funds into the Carey Campaign, as well as to induce individuals to contribute through the improper manipulation of IBT spending." *Id.* at 96.

---

1. The Consent Decree prohibits any contribution "or other things of value" to a candidate from an employer. Consent Decree ¶ 8 (amending Article IV, Section 2 of the IBT Constitution). The ban on employer contributions "reflects a desire to minimize the danger that employers will influence the outcome of union elections." *United Steelworkers of America v. Sadlowski,* 457 U.S. 102, 117, 102 S.Ct. 2339, 2348, 72 L.Ed.2d 707 (1982). Article XII, of the 1996 Election Rules also prohibits an employer from contributing, and a candidate from accepting, anything of value "where the purpose, object or foreseeable effect ... is to influence, positively or negatively, the election of a candidate." 1996 Election Rules, Article XII, Section 1(b)(1). Furthermore, the 1996 Election Rules and the Labor Management Reporting and Disclosure Act ("LMRDA") prohibit labor unions from making any contributions to a candidate. 1996 Election Rules, Article XII, Section 1(b)(1) & Article XIII, Section 1; 29 U.S.C. § 481(g).

The Election Officer concluded that "[t]he Carey Campaign and each member of the Carey slate violated Article XII, Section 1(b) of the Rules by receiving the use and benefit of the prohibited contributions." *Id.* at 98. Based on these findings, the Election Officer determined that these impermissible campaign contributions may have affected the outcome of the races of every member of the Carey slate nationwide. Thus she issued her decision refusing to certify the results of the 1996 Election and ordering a new election for all positions except for those won by the Hoffa slate, and the President of Teamsters Canada, an uncontested race. *Id.* at 114–15.

John P. Morris ("Morris"), a member of the Carey slate, and candidate for International Vice President for the Eastern Region, filed a timely notice of appeal of the E.O. Decision with the Election Appeals Master, and filed his Submission in Support of Appeal ("Morris Submission") on September 4, 1997. The Election Appeals Master conducted a hearing regarding Morris' appeal on September 17, 1997. Morris argued that because his margin of victory over his nearest competitor was 14.38%, the Election Officer did not have convincing evidence that the tainted mailings affected the outcome of his election. Morris Submission at 1 (pages not numbered). Thus, Morris contended that the Eastern Region race should not be rerun. *Id.*

Following review of the arguments presented by the Election Officer and counsel for Morris, the Election Appeals Master affirmed the Election Officer's finding that the outcome of the Eastern Region race may have been affected by the tainted mailings. 97 Elec. App. 322 (KC) (October 10, 1997), ("E.A.M. Decision"), at 4, 6.

The instant appeal by Morris is directed at that portion of the E.A.M. Decision which affirmed the finding of the Election Officer that improper campaign contributions made to the Carey slate benefited the Carey slate nationally, and may have affected the outcome of the Eastern Region Vice–President race. Morris appeals only the Election Appeals Master's decision to affirm that portion of the Election Officer's remedy requiring a rerun election for the Eastern Region Vice–President office.

## DISCUSSION

### I. STANDARD EMPLOYED BY ELECTION OFFICER

■ In papers submitted to this Court, the Hoffa slate argues that, although the Election Officer ultimately decided the issue correctly, she employed an erroneous standard in reviewing the 1996 IBT Election. Statement of Hoffa Slate Re: Appeal of John Morris ("Hoffa Brief"). Therefore, before turning to the Election Appeals Master's Decision affirming the Election Officer, it is necessary to review the standard employed by the Election Officer in her decision to order a rerun election.

Article XIV, Section 3(b) of the 1996 Election Rules states that the Election Officer cannot grant a post-election protest unless "the alleged violation may have affected the outcome of the election." As the Election Officer noted in her decision, "in order to apply this rule, the Election Officer must apply the standard of review that recognizes her broad supervision and control of the election process." E.O. Decision at 102. Accordingly, the Election Officer looked by analogy to federal case law interpreting the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 401–531, for guidance in determining the appropriate standard.

As the Election Officer stated, "[f]ederal case law interpreting the LMRDA distinguishes between supervised and unsupervised elections in applying an appropriate standard of review." E.O. Decision at 102. Where a labor union conducts an unsupervised election and the Department of Labor ("DOL") later finds that a violation of Title IV of LMRDA occurred, there is a presumption that the violation affected the outcome of the election. *Wirtz v. Hotel, Motel and Club Employees Union, Local 6*, 391 U.S. 492, 506–07, 88 S.Ct. 1743, 1751–52, 20 L.Ed.2d 763 (1968). However, where the DOL supervises a labor union's election pursuant to LMRDA, "the Secretary's supervision of the [election] establishes a presumption of fairness and regularity." *Brennan v. Interna-*

*tional Union of District 50,* 499 F.2d 1051, 1059 (D.C.Cir.1974). Therefore, before setting aside a supervised election, the Secretary must find convincing evidence that the violation may have affected the outcome.

The Hoffa slate argues that the LMRDA does not apply to the Election Officer because "the Election Officer is not the Secretary of Labor and has not been nor could be delegated any authority under the LMRDA by the Secretary." Hoffa Brief at 5. Furthermore, the Hoffa slate points to a letter signed by the IBT and an Assistant United States Attorney that provides that "nothing in [the Consent Decree] precludes the Secretary of Labor's exercise of authority under the LMRDA or other federal laws." Letter dated March 15, 1989, from Randy M. Mastro, Assistant United States Attorney, to Jed S. Rakoff. This letter, they argue, "makes it absolutely clear that candidates in the 1996 IBT officers election retain their right under the LMRDA to file a complaint with the Department of Labor," and that "if such a complaint were filed ... [t]he LMRDA explicitly provides that, once it has been shown that illegal employer funds have been used to support a candidate in an internal Union election the burden is on the assisted candidate to show that the use of the illegal funds did not affect the outcome of the election." Hoffa Brief at 6. Therefore, the Hoffa slate contends that the Election Officer should not have employed the "supervised election" standard.

While the Hoffa slate is correct that the Election Officer "is not the Secretary of Labor," the Hoffa slate's argument misses the point. The Election Officer correctly determined that *"the rationale* articulated by the courts in utilizing the supervised election standard is applicable to this election." E.O. Decision at 103 (emphasis added). When the DOL supervises an election, it assists the union in planning its election and monitors each stage of the process, but the union runs its own election and controls the mechanics of the election. This Court expressly rejected such limited monitoring, and required that the Election Officer perform all stages necessary for the election process. *United States v. IBT,* 742 F.Supp. 94, 106 (S.D.N.Y.1990),

*aff'd as modified,* 931 F.2d 177 (2d Cir.1991). Considering the close supervision of the 1996 IBT Election, the Election Officer appropriately determined that the applicable standard of review that must be applied is the same standard employed in federal case law for supervised elections under LMRDA.

## II. STANDARD OF REVIEW OF DECISIONS OF ELECTION APPEALS MASTER

■ In reviewing the decisions of the Election Appeals Master, this Court applies the "arbitrary and capricious" standard of review. Findings of the Election Appeals Master and the Election Officer are entitled to great deference under the Consent Decree, and a decision of the Election Appeals Master will not be disturbed unless that decision is, on the basis of all the evidence, "arbitrary and capricious." *See, e.g., United States v. IBT ("Collins"),* 1996 WL 408608 (S.D.N.Y.); *United States v. IBT ("Cook"),* 1996 WL 392147 (S.D.N.Y.); *United States v. IBT ("Montante"),* 1996 WL 315825 (S.D.N.Y.).

## III. ELECTION APPEALS MASTER'S DECISION

■ In his Statement of the Grounds for Appeal ("Morris Brief") to this Court, Morris does not contest any of the factual findings of the Election Officer or the Election Appeals Master concerning the nature or extent of the violations of the Election Rules, nor the source of the funds used to fund the tainted mailings. Instead, after stating that he was not personally involved in the violations, he suggests that he would have won his election independent of the slate or the mailings. Morris Brief at 3–6.

In addition, he argues that although the Election Officer "properly noted that the governing standard was that for a 'supervised election' ... thus putting the burden on the Election Officer to 'find convincing evidence that the violation may have affected the outcome' of the election ... no such evidence was found." Morris Brief at 3 (quoting E.O. Decision at 102–106). Moreover, Morris argues that the Election Officer and the Election Appeals Master "erroneous-

ly placed the burden upon him to rebut the wholly speculative assumptions proffered by [them]." *Id.* at 3. He contends that the undisputed evidence of campaign violations associated with the national campaign of the entire Carey slate, was insufficient to overcome the presumption of regularity in his race because of his margin of victory.

As an initial matter, this Court must make clear that whether Morris was involved with the illegal schemes of the Carey Campaign is irrelevant. The Election Officer properly noted that "[t]he Carey Campaign and each member of the Carey slate further violated Article XII, Section 1(b) of the [1996 Election Rules] by receiving the use and benefit of the prohibited contributions. Since a candidate is strictly liable for the receipt of prohibited contributions, it is irrelevant whether Mr. Carey or any of his slate members actually knew that the contributions were improper." E.O. Decision at 97–98.

In his decision, the Election Appeals Master stated:

> "[i]t is undisputed that Mr. Morris won his race for [Eastern Region Vice–President] by a margin of 14.38% of the vote cast. Mr Carey, by contrast, won his contest with Mr. Hoffa by a margin of 3.48%. The narrowness of the Carey victory margin was noted by the Election Officer as a factor in her determination that because improper campaign contributions had been used to broadly fund extensive Carey slate campaign mailings, these tainted mailings may have affected the outcome of the election. The Election Officer applied her findings on a blanket basis to all officer elections across the country, excepting those races won by Hoffa slate members and an uncontested Canadian race."

E.A.M. Decision at 3–4. Nevertheless, the Election Appeals Master also found that an overwhelming percentage of voting members cast slate votes rather than voting for individuals, with the percentage of slate votes in the Eastern Region race reaching 90%. E.A.M. Decision at 4. Furthermore, he pointed out that the Election Officer had found that the tainted mailings had been sent into the Eastern Region and that the mailings benefited the entire Carey slate by carefully targeting the voters most likely to make the difference in the election and encouraging these voters both to vote and to vote for the entire slate. *Id.* at 4,6. Finally, the Election Appeals Master observed that the slate vote factor, the massive size of the tainted mailings, the timing of the mailings (close to the end of the campaign), and the fact that the mailings directed Carey sympathizers to vote, were more relevant than Morris' margin of victory. *Id.* at 5. Based on these reasons, the Election Appeals Master found that the tainted mailings may have affected the outcome of the Eastern Region Vice–President race.

In challenging the Election Appeals Master's finding, that the tainted mailings may have affected the outcome of the Eastern Region Vice–President race because of the overwhelming prevalence of slate voting, Morris argues that neither the Election Officer nor the Election Appeals Master introduced any evidence that the tainted mailings caused the heavy slate voting or that the percentage of slate voting was higher in this election than in past elections. Morris Brief at 10–11. In addition, Morris contends that his victory was independent of his affiliation with the Carey slate. *See* Morris Brief at 4–6, 11.

The voting results in the Eastern Region fail to support Morris' claims. As the Election Appeals Master stated in the E.A.M. Decision, "margins of victory *per se* do not support inferences one way or the other." E.A.M. Decision at 5. The Election Appeals Master noted that the vote totals indicate that support for Carey was even stronger than support for Morris in the Eastern Region, and that slate affiliation was the critical factor in determining the outcome of the Eastern Region race. Brief of Judge Kenneth Conboy, Election Appeals Master, November 3, 1997 ("E.A.M. Brief"), at 5, 7. In the Eastern Region, Carey out polled Morris garnering 83,755 votes (22,459 votes more than his challenger) to Morris' 81,631 votes (21,109 votes more than his closest challenger), a difference of more than 2000 votes. Letter from Mary Jo White, United States Attorney, by Karen B. Konigsberg, Assistant United States Attorney, to Honorable David

N. Edelstein, November 3, 1997 ("Government Letter") at 5. Thus in the East, Carey won over his challenger by a greater margin than did Morris.

In addition, Morris' vote total is very close to the totals received by the other Carey slate candidates for Eastern Region Vice-President. His totals are less than 1500 more than the lowest Carey slate vote getter and less than 300 votes more than the next highest Carey slate vote getter. *Id.* This suggests that Morris' affiliation with the Carey slate, as opposed to his purported vote-getting ability, may have been responsible for the size of his margin of victory. As the Election Appeals Master stated in papers submitted to this Court, "[t]o the exten[t] that the primary purpose of the illicit funding scheme was to stimulate a large Carey vote in the Eastern Region to offset a large Hoffa vote [expected] in the Central Region . . ., the victory margin of Eastern Region slate members *grew in direct proportion* to its effectiveness." E.A.M. Brief at 7.

As previously noted, the standard used by this Court in reviewing the decisions of the Election Appeals Master is the "arbitrary and capricious" standard. Heavy slate voting in the Eastern Region along with the prohibited employer and IBT funds used to fund a large direct mail campaign for the Carey slate provide ample support for the Election Appeals Master's determination that the Election Officer had found convincing evidence overcoming the presumption of fairness and regularity in deciding that the illegally funded mailings *may* have affected the outcome of the Eastern Region Vice President race despite Morris' margin of victory. Therefore, this Court finds that the Election Appeals Master's decision to affirm the Election Officer is neither arbitrary nor capricious.

The violations of the 1996 IBT Election Rules were egregious violations that have caused extraordinary injury to the reform movement in the IBT. As the Election Officer noted in the E.O. Decision, IBT members "cannot have confidence in the Consent Decree if [this Court and its appointed officers] do not take effective action to prevent and remedy such misconduct." E.O. Decision at

114. The rerun of all of the races that may have been affected by the serious violations of the Election Rules is not only appropriate, but necessary to ensure that the reform effort and the culture of democracy that has begun to take root in this Union survives.

*CONCLUSION*

For the foregoing reasons, the Election Appeals Master's decision is affirmed.

SO ORDERED.