WIRTZ, SECRETARY OF LABOR *v.* LOCAL 153,
GLASS BOTTLE BLOWERS ASSOCIATION
OF THE UNITED STATES AND
CANADA, AFL–CIO.

No. 57.   Argued November 8, 1967.—Decided January 15, 1968.

*Louis F. Claiborne* argued the cause for petitioner.
With him on the brief were *Solicitor General Marshall,*

*Acting Assistant Attorney General Eardley, Richard A. Posner, Alan S. Rosenthal, Robert V. Zener, Charles Donahue, James R. Beaird* and *Beate Bloch.*

*Albert K. Plone* argued the cause and filed a brief for respondent.

*J. Albert Woll, Laurence Gold* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae,* urging affirmance.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Petitioner, the Secretary of Labor, filed this action in the District Court for the Western District of Pennsylvania seeking a judgment declaring void the election of officers conducted by respondent Local Union on October 18, 1963, and directing that a new election be conducted under the Secretary's supervision.

Section 402 (b) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U. S. C. § 482 (b), authorizes the Secretary of Labor, upon complaint by a union member who has exhausted his internal union remedies, to file the suit when an investigation of the complaint gives the Secretary probable cause to believe that the union election was not conducted in compliance with the standards prescribed in § 401 of the Act, 29 U. S. C. § 481. If the court finds that a violation of § 401 occurred which "may have affected the outcome of an election," it "shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary." [1] The alleged illegality in the

---

[1] LMRDA § 402, 29 U. S. C. § 482:

"(a) A member of a labor organization—

"(1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or

"(2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation,

election was a violation of the provision of § 401 (e), 29 U. S. C. § 481 (e), that in a union election subject to the Act every union member "in good standing shall be eligible to be a candidate and to hold office (subject to . . . reasonable qualifications uniformly imposed) . . . ."

---

may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 401 (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide.

"(b) The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this title has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court of the United States in which such labor organization maintains its principal office to set aside the invalid election, if any, and to direct the conduct of an election or hearing and vote upon the removal of officers under the supervision of the Secretary and in accordance with the provisions of this title and such rules and regulations as the Secretary may prescribe. . . .

"(c) If, upon a preponderance of the evidence after a trial upon the merits, the court finds—

.          .          .          .          .

"(2) that the violation of section 401 may have affected the outcome of an election,

the court shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization. . . .

"(d) An order directing an election, dismissing a complaint, or designating elected officers of a labor organization shall be appealable in the same manner as the final judgment in a civil action, but an order directing an election shall not be stayed pending appeal."

The complaining union member invoked his internal union remedies on October 24, 1963, and, not having received a final decision within three calendar months, filed a timely complaint with the Secretary.

A Local bylaw provided that union members had to have attended 75% of the Local's regular meetings in the two years preceding the election to be eligible to stand for office.[2] The union member whose complaint invoked the Secretary's investigation had not been allowed to stand for President at the 1963 election because he had attended only 17 of the 24 regular monthly meetings, one short of the requisite 75%; under the bylaws, working on the night shift was the only excusable absence and none of his absences was for this reason.

The District Court held that the meeting-attendance requirement was an unreasonable restriction upon the eligibility of union members to be candidates for office and therefore violated § 401 (e),[3] but dismissed the suit on the ground that it was not established that the violation "may have affected the outcome" of the election. 244 F. Supp. 745. The Secretary appealed to the Court

---

[2] Article IX, § 1, of the International Constitution provided that:

"All candidates for office, before nomination, must have attended 75 per cent of the meetings for at least two years prior to the election."

Article 4, § 12, of the Local's bylaws provided:

"No member may be a candidate unless said member is in good standing and has attended seventy-five per cent (75%) of the regular local meetings since the last local election."

And § 13 further provided:

"In cases where members have to work at the time of meetings, and so notify the Recording Secretary, they shall be marked present at such meetings, provided they notify the Secretary in writing within seventy-two (72) hours following the meeting. . . ."

[3] As a consequence of the meeting-attendance requirement, only 11 of the 500-member Local were eligible to run for office in 1963. The Vice President and Financial Secretary ran for re-election unopposed and there were no candidates for Recording Secretary and for three Trustee positions. These positions were filled by appointment of members who could not have qualified as candidates under the meeting-attendance requirement.

of Appeals for the Third Circuit. The appeal was pending when the Local conducted its next regular biennial election in October 1965. The Court of Appeals held that the Secretary's challenge to the 1963 election was mooted by the 1965 election, and therefore vacated the District Court judgment with the direction to dismiss the case as moot. In consequence, the court did not reach the merits of the question whether the unlawful meeting-attendance qualification may have affected the outcome of the 1963 election. 372 F. 2d 86.[4] Because the question whether the intervening election mooted the Secretary's action is important in the administration of the LMRDA, we granted certiorari, 387 U. S. 904, and set the case for oral argument with No. 58, *Wirtz* v. *Local 125, Laborers' Int'l Union, post,* p. 477. We reverse.

The holding of the Court of Appeals did not rest on any explicit statutory provision that on the happening of another unsupervised election the Secretary's cause of action should be deemed to have "ceased to exist." *California* v. *San Pablo & T. R. Co.,* 149 U. S. 308, 313.[5] Indeed a literal reading of § 402 (b) would more reason-

---

[4] Pending decision on the appeal, the Court of Appeals, on the Secretary's application, remanded the case to the District Court to permit the Secretary to make a post-judgment motion to have the 1965 election declared invalid. The District Court denied the motion. That denial was also appealed to the Court of Appeals, which affirmed on the ground that "absent a complaint by a union member challenging the 1965 election, the Secretary had no authority to sue to establish the invalidity of that election." 372 F. 2d, at 88. Our decision makes unnecessary any consideration of the correctness of that holding.

[5] The Court of Appeals adopted the holding of the Court of Appeals for the Second Circuit in *Wirtz* v. *Local 410, IUOE,* 366 F. 2d 438. The Court of Appeals for the Sixth Circuit in No. 58, *Wirtz* v. *Local 125, Laborers' Int'l Union, supra,* also followed the Second Circuit.

ably compel the contrary conclusion. For no exceptions are admitted by the unambiguous wording that when "the violation of § 401 may have affected the outcome of an election, the court *shall* declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary . . . ." (Emphasis supplied.)

Nonetheless, this does not end the inquiry. We have cautioned against a literal reading of congressional labor legislation; such legislation is often the product of conflict and compromise between strongly held and opposed views, and its proper construction frequently requires consideration of its wording against the background of its legislative history and in the light of the general objectives Congress sought to achieve. See, *e. g., National Woodwork Mfrs. Assn.* v. *NLRB,* 386 U. S. 612, 619. The LMRDA is no exception.[6]

A reading of the legislative history of the LMRDA, and of Title IV in particular, reveals nothing to indicate any consideration of the possibility that another election might intervene before a final judicial decision of the Secretary's challenge to a particular election. The only reasonable inference is that the possibility did not occur to the Congress.[7] We turn therefore to the question

---

[6] Archibald Cox, who actively participated in shaping much of the LMRDA, has remarked:

"The legislation contains more than its share of problems for judicial interpretation because much of the bill was written on the floor of the Senate or House of Representatives and because many sections contain calculated ambiguities or political compromises essential to secure a majority. Consequently, in resolving them the courts would be well advised to seek out the underlying rationale without placing great emphasis upon close construction of the words." Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L. Rev. 819, 852 (1960).

[7] There are references to the desirability of expeditious determinations of the Secretary's suits, but it is clear from the contexts in which they appear that the concern was to settle as quickly as practicable the cloud on the incumbents' titles to office and not to

whether, in light of the objectives Congress sought to achieve, the statute may properly be construed to terminate the Secretary's cause of action upon the fortuitous event of another unsupervised election before final judicial decision of the suit.

The LMRDA has seven subdivisions dealing with various facets both of internal union affairs and of labor-management relations. The enactment of the statute was preceded by extensive congressional inquiries upon which Congress based the findings, purposes, and policy expressed in § 2 of the Act, 29 U. S. C. § 401.[8] Of special significance in this case are the findings that "in the public interest" remedial legislation was necessary to

avoid possible intervention of another election. See S. Rep. No. 187, 86th Cong., 1st Sess., 21, I Leg. Hist. 417; 104 Cong. Rec. 7954, Leg. Hist. 699 (Dept. Labor 1964) (hereafter cited D. L. Leg. Hist.) (Senator Kennedy); 104 Cong. Rec. 11003, D. L. Leg. Hist. 710 (Senator Smith); cf. Cox, The Role of Law in Preserving Union Democracy, 72 Harv. L. Rev. 609, 631–634 (1959). The provision of § 402 (d), 29 U. S. C. § 482 (d), that "an order directing an election shall not be stayed pending appeal" is consistent with the concern that challenges to incumbents' titles to office be resolved as quickly as possible.

[8] The background and legislative history of the 1959 Act are discussed in Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv. L. Rev. 851 (1960); Cox, Internal Affairs of Labor Unions, *supra*, n. 6; Levitan & Loewenberg, The Politics and Provisions of the Landrum-Griffin Act, in Regulating Union Government 28 (Estey, Taft & Wagner eds. 1964); Rezler, Union Elections: The Background of Title IV of LMRDA, in Symposium on LMRDA 475 (Slovenko ed. 1961). And see Cox, Preserving Union Democracy, *supra*, n. 7, at 628–634.

Although Senator Kennedy, a principal sponsor of the legislation, counseled against mixing up the interests of providing for internal union democracy and of enacting measures concerned with relations between labor and management, see 105 Cong. Rec. 883–885, II Leg. Hist. 968–969; cf. S. Rep. No. 187, *supra*, n. 7, at 5–7, I Leg. Hist. 401–403, neither the debates nor the Act itself reveals unwavering adherence to this principle. See, *e. g.*, Cox, Internal Affairs of Labor Unions, *supra*, n. 6, at 831–833.

further the objective "that labor organizations . . . and their officials adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations . . . ," 29 U. S. C. § 401 (a), this because Congress found, "from recent investigations in the labor and management fields, that there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct . . ." requiring "supplementary legislation that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations . . . and their officers and representatives." 29 U. S. C. § 401 (b).

Title IV's special function in furthering the overall goals of the LMRDA is to insure "free and democratic" elections.[9] The legislative history shows that Congress

---

[9] "It needs no argument to demonstrate the importance of free and democratic union elections. Under the National Labor Relations and Railway Labor Acts the union which is the bargaining representative has power, in conjunction with the employer, to fix a man's wages, hours, and conditions of employment. The individual employee may not lawfully negotiate with his employer. He is bound by the union contract. In practice, the union also has a significant role in enforcing the grievance procedure where a man's contract rights are enforced. The Government which gives unions this power has an obligation to insure that the officials who wield it are responsive to the desires of the men and women whom they represent. The best assurance which can be given is a legal guaranty of free and periodic elections. The responsiveness of union officers to the will of the members depends upon the frequency of elections, and an honest count of the ballots. Guaranties of fairness will preserve the confidence of the public and the members in the integrity of union elections." S. Rep. No. 187, *supra*, n. 7, at 20; and H. R. Rep. No. 741, 86th Cong., 1st Sess., 15–16, I Leg. Hist. 416, 773–774. See S. Rep. No. 187, *supra*, at 2–5, H. R. Rep. No. 741, *supra*, at 1–7, I Leg. Hist. 398–401, 759–765.

weighed how best to legislate against revealed abuses in union elections without departing needlessly from its long-standing policy against unnecessary governmental intrusion into internal union affairs.[10] The extensive and vigorous debate over Title IV manifested a conflict over the extent to which governmental intervention in this most crucial aspect of internal union affairs was necessary or desirable. In the end there emerged a "general congressional policy to allow unions great latitude in resolving their own internal controversies, and, where that fails, to utilize the agencies of Government most familiar with union problems to aid in bringing about a settlement through discussion before resort to the courts." *Calhoon* v. *Harvey,* 379 U. S. 134, 140.

But the freedom allowed unions to run their own elections was reserved for those elections which conform to the democratic principles written into § 401. International union elections must be held not less often than once every five years and local union elections not less often than once every three years. Elections must be

[10] See S. Rep. No. 187, *supra,* n. 7, at 7, I Leg. Hist. 403:

"In acting on this bill [S. 1555] the committee followed three principles: 1. The committee recognized the desirability of minimum interference by Government in the internal affairs of any private organization. . . . [I]n establishing and enforcing statutory standards great care should be taken not to undermine union self-government or weaken unions in their role as collective-bargaining agents. 2. Given the maintenance of minimum democratic safeguards and detailed essential information about the union, the individual members are fully competent to regulate union affairs. . . . 3. Remedies for the abuses should be direct. . . . [T]he legislation should provide an administrative or judicial remedy appropriate for each specific problem."

See also *ibid.:* "The bill reported by the committee, while it carries out all the major recommendations of the [McClellan] committee, does so within a general philosophy of legislative restraint."

The election title of the Senate bill referred to in the Committee Report was enacted virtually as drafted by the Senate.

by secret ballot among the members in good standing except that international unions may elect their officers at a convention of delegates chosen by secret ballot. 29 U. S. C. §§ 481 (a), (b). Specific provisions insure equality of treatment in the mailing of campaign literature; require adequate safeguards to insure a fair election, including the right of any candidate to have observers at the polls and at the counting of ballots; guarantee a "reasonable opportunity" for the nomination of candidates, the right to vote without fear of reprisal, and, pertinent to the case before us, the right of every member in good standing to be a candidate, subject to "reasonable qualifications uniformly imposed." 29 U. S. C. §§ 481 (c), (e).

Even when an election violates these standards, the stated commitment is to postpone governmental intervention until the union is afforded the opportunity to redress the violation. This is the effect of the requirement that a complaining union member must first exhaust his internal union remedies before invoking the aid of the Secretary. 29 U. S. C. § 482 (a). And if the union denies the member relief and he makes a timely complaint to the Secretary, the Secretary may not initiate an action until his own investigation confirms that a violation of § 401 probably infected the challenged election. Moreover, the Secretary may attempt to settle the matter without any lawsuit; the objective is not a lawsuit but to "aid in bringing about a settlement through discussion before resort to the courts." *Calhoon* v. *Harvey, supra.* And if the Secretary must finally initiate an action, the election is presumed valid until the court has adjudged it invalid. 29 U. S. C. § 482 (a). Congress has explicitly told us that these provisions were designed to preserve a "maximum amount of independence and self-government by giving every inter-

national union the opportunity to correct improper local elections." S. Rep. No. 187, 86th Cong., 1st Sess., 21, I Leg. Hist. 417.

But it is incorrect to read these provisions circumscribing the time and basis for the Secretary's intervention as somehow conditioning his right to relief once that intervention has been properly invoked. Such a construction would ignore the fact that Congress, although committed to minimal intervention, was obviously equally committed to making that intervention, once warranted, effective in carrying out the basic aim of Title IV.[11] Congress deliberately gave exclusive enforcement authority to the Secretary, having "decided to utilize the special knowledge and discretion of the Secretary of Labor in order best to serve the public interest." *Calhoon* v. *Harvey, supra.* In so doing, Congress rejected other proposals, among them plans that would have authorized suits by complaining members in their own right.[12] And Congress unequivocally declared that

---

[11] See, *e. g.,* S. Rep. No. 187, *supra,* n. 7, at 34, I Leg. Hist. 430:

"The committee bill places heavy reliance upon reporting and disclosure to union members, the Government and the public to effect correction of abuses where they have occurred. *However, the bill also endows the Secretary of Labor with broad power to insure effectuation of its objectives. . . .*

.        .        .        ..        .

" . . . He has power to— . . . (e) investigate violations of the election provisions and bring court actions to overturn improperly held elections and supervise conduct of new elections . . . .

"The committee believes that the *broad powers granted to the Secretary* by this bill combined with full reporting and disclosure to union members and the public *provides a most effective combination of devices by which abuses can be remedied."* (Emphasis supplied.)

[12] S. 748, 86th Cong., 1st Sess., I Leg. Hist. 84, 118–134; H. R. 8342, 86th Cong., 1st Sess., I Leg. Hist. 687, 727–729. See H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 35, I Leg. Hist. 939.

once the Secretary establishes in court that a violation of § 401 may have affected the outcome of the challenged election, "the court *shall* declare the election . . . to be void and direct the conduct of a new election under supervision of the Secretary . . . ." 29 U. S. C. § 482 (c). (Emphasis supplied.)

We cannot agree that this statutory scheme is satisfied by the happenstance intervention of an unsupervised election. The notion that the unlawfulness infecting the challenged election should be considered as washed away by the following election disregards Congress' evident conclusion that only a supervised election could offer assurance that the officers who achieved office as beneficiaries of violations of the Act would not by some means perpetuate their unlawful control in the succeeding election. That conclusion was reached in light of the abuses surfaced by the extensive congressional inquiry showing how incumbents' use of their inherent advantage over potential rank and file challengers established and perpetuated dynastic control of some unions. See S. Rep. No. 1417, 85th Cong., 2d Sess. These abuses were among the "number of instances of breach of trust . . . [and] disregard of the rights of individual employees . . ." upon which Congress rested its decision that the legislation was required in the public interest.[13] Congress chose the alternative of a supervised election as the remedy for a § 401 violation in the belief that the protective presence of a neutral Secretary of Labor would best prevent the unfairness in the first election from infecting, directly or indirectly, the remedial election. The choice also reflects a conclusion that union members made aware of unlawful practices could not adequately protect their own interests through an unsupervised election. It is clear, therefore, that the intervention of an election

---

[13] See, *supra,* at 469–470.

in which the outcome might be as much a product of unlawful circumstances as the challenged election cannot bring the Secretary's action to a halt. Aborting the exclusive statutory remedy would immunize a proved violation from further attack and leave unvindicated the interests protected by § 401. Title IV was not intended to be so readily frustrated.

Respondent argues that granting the Secretary relief after a supervening election would terminate the new officers' tenure prematurely on mere suspicion. But Congress, when it settled on the remedy of a *supervised* election, considered the risk of incumbents' influence to be substantial, not a mere suspicion. The only assurance that the new officers do in fact hold office by reason of a truly fair and a democratic vote is to do what the Act requires, rerun the election under the Secretary's supervision.

The Court of Appeals concluded that it would serve "no practical purpose" to void an old election once the terms of office conferred have been terminated by a new election. We have said enough to demonstrate the fallacy of this reasoning: First, it fails to consider the incumbents' possible influence on the new election. Second, it seems to view the Act as designed merely to protect the right of a union member to run for a particular office in a particular election. But the Act is not so limited, for Congress emphatically asserted a vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member.

We therefore hold that when the Secretary of Labor proves the existence of a § 401 violation that may have affected the outcome of a challenged election, the fact that the union has already conducted another unsupervised election does not deprive the Secretary of his right to a court order declaring the challenged election void

and directing that a new election be conducted under his supervision.[14]

The judgment of the Court of Appeals is reversed and the case remanded to that court with direction to decide the merits of the Secretary's appeal.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

---

[14] There is much discussion in the briefs of possible alternatives to our conclusion, such as expediting proceedings under § 402 to bring about their final decision before the next regular election, or injunctive relief against the conduct of that election pending final decision in the Secretary's suit. That discussion, however, assumes a construction of the statute contrary to that which we have reached and therefore requires no comment.