Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

LOCAL 10902, COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO, Defendant-Appellee.

No. 80–7662.

United States Court of Appeals, Fifth Circuit. Unit B

July 17, 1981.

Beate Bloch, Susan M. Webman, U.S. Dept. of Labor, Washington, D.C., for plaintiff-appellant.

Cooper, Mitch & Crawford, Thomas N. Crawford, Jr., Birmingham, Ala., for defendant-appellee.

Before MILLER *, Judge, and FRANK M. JOHNSON, Jr. and THOMAS A. CLARK, Circuit Judges.

PER CURIAM:

The Secretary of Labor (Secretary) brought this action under Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA)[1] to set aside the 1978 regular triennial election of officers conducted by appellee (Union). The Secretary's complaint, which was triggered by a timely complaint to him (after the Union failed to respond to appropriate protest) by a member of the Union in good standing, alleged that the Union had violated section 401(c) of LMRDA[2] (29 U.S.C. § 481(c)) by failing to provide adequate safeguards to insure a fair election; and had violated section 401(e) thereof[3] (29 U.S.C. § 481(e)) by denying members in good standing the right to vote for the candidate or candidates of their choice, failing to preserve for one year the ballots and other records relating to the election, and failing to conduct the election in accordance with its bylaws.[4] The case was decided on stipulated facts and the testimony of two witnesses. The district court found in favor of the Union and dismissed the Secretary's complaint. We reverse and remand.

The initial balloting of the protested election to fill eight offices took place from October 30 to November 17, 1978, and a runoff election for five of the eight offices was held from November 20 to December 7, 1978. Balloting was by mail. During the period of September through December of 1978, the Union had approximately 3,638 members in good standing who were eligible to vote. Although it was receiving the monthly H–166A list (a computer printout of all dues paying members and their addresses) from its parent body, and although the Union's bylaws require the use of this list to determine eligibility in elections, the Union did not use it in the 1978 fall election

---

* Judge of the United States Court of Customs and Patent Appeals, sitting by designation.

1. 73 Stat. 519 et seq. (29 U.S.C. § 401 et seq.).

2. Section 401(c) provides in pertinent part:
   Every bona fide candidate shall have the right, once within 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the principal office of such labor organization by a designated official thereof. Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots.

3. Section 401(e) provides, in pertinent part, that
   every member in good standing shall be eligible to be a candidate and to hold office ... and shall have the right to vote for or otherwise support the candidate or candidates of his choice .... The votes cast by members of each local labor organization shall be counted, and the results published, separately. The election officials designated in the constitution and bylaws or the secretary, if no other official is designated, shall preserve for one year the ballots and all other records pertaining to the election. The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this subchapter.

4. Article XIV, Section 4B provides:
   Only members of the local in good standing shall be eligible to vote or hold office.
   1. The eligibility list shall be compiled from the most current H–166A list in the Local office, plus any new members accepted by the membership.
   The office secretary of the Union testified that the H–166A list "comes from the International once a month ... has a list of all of our dues paying members, their addresses and so forth."

mail balloting and, instead, used its own address-plate file.[5]

During the year preceding the election, the Union had made several mailings to its members using the address-plate file, and, in each instance, approximately 500 of the mailed items had been returned by the Postal Service as undeliverable. It was not until after the election that the Union updated its records, so that subsequent mailings resulted in only about 100 undeliverable returns. There has been no allegation by the Secretary that any fraud or bad faith was involved in the election.

On October 30, 1978, the Union mailed 3,641 ballots to its members in the initial phase of the fall election. Of these, 529 were returned as undeliverable; 981 voted ballots were returned, of which 955 were counted (26 were voided). Subsequent comparison of the envelopes from the counted ballots with the H–166A list established that at least 6 and possibly as many as 95 ballots were cast by ineligible persons. A further comparison showed that 52 of the 529 undeliverable ballots had been mailed to ineligible persons, so that 477 eligible members did not receive ballots. The three officers declared elected on the basis of the initial phase of the fall election won by margins of 84, 102, and 139 votes; the margins between candidates placing second and third for the five offices for which a runoff (between first and second place) was held ranged from 3 to 227 votes.

In the runoff phase of the fall election, 895 ballots were voted and 537 were returned as undeliverable. Of the 895 ballots voted, 80 were voided on the basis of a check against the H–166A list. The runoffs were decided by margins ranging from 19 to 89 votes.

The district court found "no basis for the faintest inference of fraud or bad faith" and "no whisper of a union policy to suppress dissent or of any contrivance to disfranchise any eligible voter by mailing his ballot to an improper address." Although

support for the relevance of such findings can be found in dicta in *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir. 1973), the Supreme Court indicated a contrary view in *Wirtz v. Hotel Employees Local 6*, 391 U.S. 492, 503, 88 S.Ct. 1743, 1750, 20 L.Ed.2d 763 (1968), saying: "Congress designed Title IV to curb the possibility of abuse by benevolent as well as malevolent entrenched leaderships." The policy underlying this statement was explained as follows (*id.* at 496–97, 88 S.Ct. at 1746–47):

Earlier this Term, we observed that "Title IV's special function in furthering the overall goals of the LMRDA is to insure 'free and democratic' elections. The legislative history shows that Congress weighed how best to legislate against revealed abuses in union elections without departing needlessly from its long-standing policy against unnecessary governmental intrusion into internal union affairs." *Wirtz v. Local 153, Glass Bottle Blowers Assn.*, 389 U.S. 463, 470–471 [88 S.Ct. 643, 647–648, 19 L.Ed.2d 705.] . . . [T]he congressional concern to avoid unnecessary intervention was balanced against the policy expressed in the Act to protect the public interest by assuring that union elections would be conducted in accordance with democratic principles. . . . In a companion case, *Wirtz v. Local 125, Laborers' Int'l Union*, 389 U.S. 477, 483 [88 S.Ct. 639, 642, 19 L.Ed.2d 716], we said that the provisions of § 401 are "necessary protections of the public interest as well as of the rights and interests of union members." In sum, in § 401 ". . . Congress emphatically asserted a vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union members." *Wirtz v. Bottle Blowers, supra*, [389 U.S.] at 475, [88 S.Ct. at 650.]

The district court also found that "reference to the stipulated numbers is conclusive that they could not have affected

---

**5.** The nominations for the fall of 1978 election were held in accordance with the Union's constitution and bylaws.

the outcome of the elections." And the Union argues that "[t]he violations complained of by the Secretary cannot be said to have affected the results of the election, as required by the Act." However, these statements overlook the plain meaning of section 402(c) of the LMRDA [6] (29 U.S.C. § 482(c)) and the Supreme Court's careful analysis of the legislative history thereof (including, particularly, the conference report at 105 Cong.Rec. 19765):

> The provision that the finding should be made "upon a preponderance of the evidence" was left undisturbed [by the Conference Committee] when the change was made. That provision is readily satisfied, however, as is the congressional purpose in changing "affected" to "may have affected" in order to avoid rendering the proposed "remedy practically worthless," by ascribing to a proved violation of § 401 the effect of establishing a prima facie case that the violation "may have affected" the outcome. The effect may of course be met by evidence which supports a finding that the violation did not affect the result.

*Id.* at 506–07, 88 S.Ct. at 1751–52. We are satisfied that a preponderance of the evidence, *viz.*, the stipulated numbers in both the initial and runoff phases of the fall election, clearly shows that the Union's violation of section 401 of the LMRDA may have affected the outcome of the election [7] and that the prima facie case thus established has not been rebutted by the evidence of record.

 We note that under the Union's by-laws providing for the triennial nomination and election of officers, nominations are to take place at the September 1981 regular membership meeting, with the elections scheduled for later this year. Because there has been no allegation that any fraud or bad faith was involved in the 1978 elections, we do not believe it essential that said elections immediately be declared void, placing upon the Union the burden of conducting new nomination and election of officers prior to the regular triennial nomination and election of officers. Rather, we believe that the purposes of the LMRDA will be adequately served by providing that the status quo of present officers will be maintained until installation of newly elected officers at the Union's regular December 1981 meeting; [8] and, further, that the new election required by section 402(c) of the LMRDA will be satisfied by the regular triennial nomination and election of officers under the supervision of the Secretary. *See Hodgson v. Local 1299, United Steelworkers of America*, 453 F.2d 565, 577–78 (6th Cir. 1971).

The judgment of the district court dismissing the complaint is REVERSED and the case is REMANDED for further proceedings in accordance with this opinion.

---

6. Section 402(c), in pertinent part, provides:
    If, upon a preponderance of the evidence after a trial upon the merits, the court finds—
    (1) that an election has not been held within the time prescribed by section 481, or
    (2) that the violation of section 481 of this title may have affected the outcome of an election,
    the court shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary
    . . . .

7. We note that, in each instance, the combined total of all eligible members who were denied their right to vote plus ineligible voters who voted or may have voted was well in excess of the margin deciding the election: 84, 102, and 139 votes in the three contests decided in the initial balloting; 3 to 227 votes between second and third place in the initial balloting for the other five contests and 19–89 votes in the runoff.

8. Although the bylaws provide that newly installed officers "shall assume duties of office the following January 1st," it does not appear that, in this instance, there would be any inconvenience to the Union to have the newly elected officers assume their duties upon installation.