**KRASKA, Walter and Gorka, Joseph**

v.

**UNITED MINE WORKERS OF AMERICA, et al.**

**Appeal of INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, et al.**

**No. 81–2922.**

United States Court of Appeals, Third Circuit.

Argued June 8, 1982.

Decided Aug. 20, 1982.

Griffith, Aponick & Musto, Kanjorski & Kanjorski, Wilkes-Barre, Pa. (Ralph E. Kates, III, Argued, Brian P. Dempsey, Wilkes-Barre, Pa., on the brief), for appellees.

Harrison Combs, Peter Mitchell, United Mine Workers of America, Washington, D. C., Melvin P. Stein (Argued), John M. Tishok, Kuhn, Engle & Stein, Pittsburgh, Pa., for appellants (except William Savitsky).

Robert C. Cohen (Argued), Markowitz & Richman, Philadelphia, Pa., for William Savitsky.

Before ADAMS and WEIS, Circuit Judges, and BLOCH,* District Judge.

* Hon. Alan N. Bloch, United States District Court for the Western District of Pennsylvania,

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal raises a narrow question of statutory construction: whether an intervening union election divests a federal district court of jurisdiction previously—and properly—assumed under Title I of the Labor Management Reporting and Disclosure Act of 1959 (LMRDA). We conclude that it does not, and accordingly affirm the order of the district court granting a preliminary injunction in favor of the plaintiffs.

### I

Plaintiffs Walter Kraska and Joseph Gorka were the President and Secretary-Treasurer, respectively, of District 25, a territorial unit of the United Mine Workers (UMW). Early in 1980, the union's International Executive Board (IEB) removed the two men from their posts for refusing to pay disciplinary fines assessed against them. Six months later, Kraska and Gorka filed an action in the district court against the UMW, the IEB, and a number of union officers, alleging that their removal had violated their rights, guaranteed by Title I of the LMRDA, "to ... fulfill their duly elected terms of office and their responsibilities in their respective positions." Appendix at 19a.

At a pre-trial conference held in November, 1980, counsel for Kraska and Gorka informed the court that District 25 was scheduled to hold a quadrennial election in 1981. In response to the attorneys' concern that the defendants would attempt to block plaintiffs' participation in the upcoming campaign, the district judge ordered counsel for the defendants to "determine if the Union and [defendants] believe [plaintiffs] are not eligible to aspire for their former offices." Appendix at 52a. Several months later the plaintiffs formed a slate and entered the race; Kraska running for district representative to the IEB; Gorka seeking his former post as Secretary-Treasurer, and

sitting by designation.

various supporters filing for other offices. Within weeks, Kraska and Gorka received indications that the Election Committee of District 25 might disqualify them. In response, they filed a motion for a preliminary injunction in which they asked to be reinstated in office.

In a status memorandum filed at the behest of the district court in May, 1981, the defendants asserted that Kraska and Gorka were "members in good standing" of the UMW and further argued that a preliminary injunction was inadvisable because such relief would interfere with the upcoming election:

> Plaintiffs and defendants directly involved in District 25 have placed the issues before the voting membership of District 25. *In the last analysis the question of who should lead District 25 in the four years ahead should be decided by that membership.* Again the object of the Federal laws is to secure for that membership a fair and unfettered right to elect its leadership. The crux of the case at bar is the propriety of past actions. *Plaintiffs' Pre-trial memorandum does not complain that Plaintiffs' right or ability to campaign for the new offices they seek have been or are being interfered with.*
>
> In the exercise of its discretion and in the public interest and interest of the Federal labor laws, *this Court should not interfere in the unfettered political ebb and flow which will on June 9, 1981 determine the leadership of District 25 henceforth. Thereafter, if the parties, freed of the political restraints of an ongoing election campaign cannot resolve the issues posed by this case, the Court can adjudicate them in accordance with normal procedures.*

Appendix at 53a (emphasis added).

The above representations convinced the district judge that the UMW did not contest plaintiffs' eligibility for office. He concluded, therefore, that many of the issues raised by the plaintiffs' lawsuit would be moot after the election, especially if Kraska and Gorka won. For this reason, the district court postponed the hearing on the motion for a preliminary injunction until a date subsequent to the balloting.

The election took place on June 9, 1981. Kraska, Gorka, and all but one of their supporters won their respective races. Two weeks later, however, the District 25 Election Committee overturned the results, in part because Kraska and Gorka were alleged to have once "misappropriated" union funds. Appendix at 81a. After an appeal to the IEB, all the victors—except Kraska and Gorka—were restored to office, and a new election was ordered for the two vacant posts.

Kraska and Gorka then renewed their motion for a preliminary injunction, requesting that the district judge (1) set aside their disqualification; (2) order that they be allowed to take office; and (3) enjoin the upcoming election (which would fill the offices for which plaintiffs had been disqualified). The district court determined that it had jurisdiction under Title I of the LMRDA and granted the plaintiffs' motion. Defendants have appealed solely on the jurisdictional issue. We have appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## II

On appeal, defendants do not contest the power of the district court initially to entertain plaintiffs' Title I lawsuit, which was filed almost one year prior to the June, 1981 election. Jurisdiction over that suit was properly assumed by the district court pursuant to 29 U.S.C. § 412, which provides that "[a]ny person whose rights secured by the provisions of [Title I] have been infringed by any violation of [Title I] may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate." Defendants claim, however, that once the intervening election took place, plaintiffs could pursue only the post-election relief provided by Title IV of the Act, the portion of the LMRDA which governs union elections. The plaintiffs, on the other hand, argue that Title IV and the intervening election should not operate to deprive the district court of jurisdiction in a pending Title I suit.

While Title I gives the plaintiffs a direct cause of action against the Union, Title IV's provisions may be enforced only by the Secretary of Labor. Under Title IV, Kraska and Gorka would be required to challenge their disqualification through the Union's internal channels and then file a complaint with the Secretary of Labor if dissatisfied with the Union's response. If the Secretary "finds probable cause to believe that a violation ... has occurred," then *he* is empowered to bring suit in federal district court. 29 U.S.C. § 482(b). The statute clearly provides that *"[t]he remedy provided by this title for challenging an election already conducted shall be exclusive."* 29 U.S.C. § 483 (emphasis added).

The contrasting remedial schemes provided in Titles I and IV of the LMRDA reflect, in large measure, the underlying substantive differences between the two titles. Title IV regulates union election procedures such as the frequency of elections, the distribution of campaign literature, the inspection of membership lists, the eligibility of candidates for office, campaign financing, and the removal of officers guilty of serious misconduct. 29 U.S.C. § 481. The title thus purports to oversee a union's relationship with its membership as a whole. The rather cumbersome administrative and judicial procedures by which the provisions of Title IV may be enforced were carefully crafted by Congress to ensure that no individual could "block or delay" a union election, *Calhoon v. Harvey*, 379 U.S. 134, 140, 85 S.Ct. 292, 296, 13 L.Ed.2d 190 (1964), and "to settle as quickly as practicable the clouds on the incumbents' titles to office." *Wirtz v. Local 153, Glass Bottle Blowers Association*, 389 U.S. 463, 468 n.7, 88 S.Ct. 643, 647 n.7, 19 L.Ed.2d 705 (1968). As the Supreme Court explained in *Calhoon v. Harvey, supra*, "Reliance on the discretion of the Secretary is in harmony with the general congressional policy to allow unions great latitude in resolving their own internal controversies, and, where that fails, to utilize the agencies of Government most familiar with union problems to aid in bringing about a settlement through discussion before resort to the courts." 379 U.S.

at 140, 85 S.Ct. at 296. *See also Trbovich v. UMW*, 404 U.S. 528, 532, 92 S.Ct. 630, 633, 30 L.Ed.2d 686 (1972) (suit by the Secretary was made exclusive "for two principal reasons: (1) to protect unions from frivolous litigation and unnecessary judicial interference with their elections, and (2) to centralize in a single proceeding such litigation as might be warranted with respect to a single election").

Title I, in contrast, reflects congressional concern with the union members' rights *as individuals*. Introduced on the floor of the Senate after the remaining provisions of the bill had been drafted, Title I guarantees to each union member equal rights to participate in union affairs, freedom of speech and assembly, and the right to sue. 29 U.S.C. § 411. To ensure prompt vindication of these individual rights—modeled, as they were, on our constitutional Bill of Rights, *see United Steelworkers v. Sadlowski*, —— U.S. ——, ——, 102 S.Ct. 2339, 2343, 72 L.Ed.2d 707 (1982)—Congress provided that union members aggrieved under Title I could proceed directly with private litigation in the federal courts.

Notwithstanding the obvious differences between Titles I and IV, the substance of the two titles clearly overlaps to some extent. Title I, for example, assures that union members "shall have equal rights and privileges ... to nominate candidates, [and] to vote in elections ..." 29 U.S.C. § 411(a)(1); Title IV provides that "a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to ... reasonable qualifications uniformly imposed) and shall have the right to vote...." 29 U.S.C. § 481(e). Because the remedies furnished for the breach of these two sections diverge so dramatically, however, much of the litigation and scholarly comment in this area has been directed to the question whether, in any given set of circumstances, a plaintiff can proceed directly under Title I or must instead refer his complaint to the Secretary of Labor under Title IV. *See Calhoon v. Harvey*, 379

U.S. at 141–42, 85 S.Ct. at 296–297 (Stewart, J., concurring) (noting the substantive similarities between Titles I and IV but concluding, ultimately, that it is the "[r]emedies [which] shape the significance of rights."). *See, generally* Berchem, *Labor Democracy in America: The Impact of Titles I & IV of the Landrum-Griffin Act*, 13 Vill.L.Rev. 1 (1967); Note, *Pre-Election Remedies Under the Landrum-Griffin Act: The "Twilight Zone" Between Election Rights Under Title IV and the Guarantees of Titles I and V*, 74 Colum.L.Rev. 1105 (1974); Comment, *Titles I & IV of the LMRDA: A Resolution of the Conflict of Remedies*, 42 U.Chi.L.Rev. 166 (1974); Note, *Union Elections and the LMRDA: Thirteen Years of Use and Abuse*, 81 Yale L.J. 407 (1972).

Analysis of this issue generally has rested on two distinct factors: first, the timing of the lawsuit (was it filed and is it being disposed of before or after a union election?), and second, the nature of the underlying complaint (is it more easily characterized as a Title I, or as a Title IV, issue?). Clearly, the federal courts have jurisdiction under 29 U.S.C. § 412 to consider suits raising archetypical Title I issues, such as discrimination, that are filed prior to an election. *Depew v. Edmiston*, 386 F.2d 710 (3d Cir. 1967). Moreover, it is well established that if the complaint alleges a Title IV-type grievance—if, for example, the union member objects to eligibility standards for union office that are applied evenhandedly but are nonetheless unreasonable—direct federal litigation is precluded and the complainant must bring his objection to the Secretary of Labor. *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). This is true regardless whether the union member initiates his action before or after the disputed election. *Mamula v. United Steelworkers of America*, 304 F.2d 108 (3d Cir. 1962) (plaintiff alleged that union's constitution failed to prescribe nominating procedures; Title I suit filed prior to election is dismissed on jurisdictional grounds); *McDonough v. Local 825, International Union of Operating Engineers*, 470 F.2d 261 (3d Cir. 1972) (ballot counting dispute; suit filed post-election but before ballots were counted; no Title I jurisdiction); *McGuire v. Grand International Division of Brotherhood of Locomotive Engineers*, 426 F.2d 504 (6th Cir. 1970).

In *McDonough v. Local 825, International Union of Operating Engineers, supra,* we concluded that the district court lacked jurisdiction over McDonough's post-election suit to enjoin a recount of disputed ballots; we stated, simply, that "where an election has already been conducted, § 482 [the title IV remedy] is the exclusive remedy available." *Id.* at 264. Thus, even though McDonough's suit alleged "a preconceived, pre-existing conspiracy on the part of numerous [union] officers ... to discriminate" against one slate of candidates (*Id.* at 263)—a complaint generally cognizable under Title I—because the suit was brought in the post-election context, McDonough's sole remedy was to exhaust his union remedies and then complain to the Secretary of Labor under Title IV.[1]

The defendants in the present case claim that *McDonough* controls and mandates the dismissal of plaintiffs' Title I action. The district court rejected this contention, concluding that *McDonough* was distinguishable both on procedural and substantive grounds. First, the court noted that unlike the plaintiff in *McDonough*, Kraska and Gorka had filed their Title I claims long before the election and had made every

---

1. This Court's analysis in *McDonough* was rejected by the Ninth Circuit in *Kupau v. Yamamoto*, 622 F.2d 449 (9th Cir. 1980). In that case a union member sued under Title I after having run in a union election, won, and then been declared ineligible for office. The plaintiff alleged that the eligibility requirements had been inconsistently and unevenly applied and that this discrimination violated his Title I rights. The Ninth Circuit agreed that jurisdiction under Title I was appropriate. It distinguished *Calhoon v. Harvey, supra,* in which the Supreme Court held that a union member could challenge an eligibility requirement as too restrictive only by filing a Title IV complaint with the Secretary of Labor. In *Calhoon* the eligibility qualifications had been evenly applied to all members of the union; in *Kupau*, the plaintiff was alleging discriminatory application of the eligibility requirements.

reasonable effort to obtain a prompt ruling. Moreover, while *McDonough* concerned ballot counting—a procedure traditionally overseen by the provisions of Title IV— Kraska and Gorkas' suit charged the defendants with a "classic Title I violation," namely, discriminatory disqualification. The court reasoned that the policy grounds underlying the exclusivity feature of the Title IV remedy—recognition of the Secretary of Labor's expertise; protection of union independence from judicial interference; expeditious resolution of election disputes; and consolidation of all election challenges into one proceeding—would not be served if Kraska and Gorka were forced to abandon their Title I claim.

We agree with the district court that, in the peculiar factual circumstances present here, *McDonough* does not preclude plaintiffs' Title I action. In a situation such as this, in which the plaintiff has filed a bona fide Title I action prior to the election but the resolution of that claim does not occur until after an election has been held (and the delay has been caused by apparent misrepresentation by the defendants to the court), it would not appear appropriate to dismiss the suit on jurisdictional grounds. Moreover, while in *McDonough* it is uncertain whether the plaintiffs' claim *ever* could have been brought under Title I, even in a pre-election setting,[2] here the plaintiffs clearly have alleged Title I violations that are completely unrelated to the June 1981 election. Indeed, by its terms, the "exclusive" remedial scheme set forth in Title IV does not appear to apply to the situation here, where plaintiffs are not so much "challenging an election already conducted," 29 U.S.C. § 483, as they are objecting to discriminatory conduct that occurred nearly two years prior to the election in question.

Forcing the plaintiff in this case to rely upon a Title IV remedy would have disturbing consequences. For one thing, even if the Secretary of Labor decided to press suit against the union, the ultimate result of such litigation could only be the declaration, by the court, that the election was void and a direction to conduct a new election. 29 U.S.C. § 482(c). In the context of this case, that remedy is meaningless. No one has stated that the election itself was improperly conducted and there appears to be no reason why the results of the election should not stand, assuming the subsequent disqualification of Kraska and Gorka is eventually found to be improper. Moreover, as the district court persuasively noted, a dismissal on jurisdictional grounds "would encourage labor unions to delay Title I violations until after the voting in order to saddle the grievant with the more cumbersome remedy of Title IV." Appendix at 62a. We decline to adopt an interpretation of 29 U.S.C. §§ 412 and 483 that would lead, inevitably, to such a result.

### III

The order of the district court granting plaintiffs' motion for a preliminary injunction will be affirmed.

---

**2.** The *McDonough* court did not decide whether, had the case been brought prior to the election, the plaintiff would have "stated a cause of action under [Title I] despite his not having alleged that *he* was not permitted to vote or that *his vote* was not going to be counted." 470 F.2d at 264. We agree with the district court in the present case that, while the plaintiff in *McDonough* "attempted to couch [his] complaint in terms of Title I . . . the fact remains that the suit concerned ballot counting and the LMRDA clearly provides that improprieties with regard to that procedure must be remedied under Title IV." Appendix at 63a (citing *Marshall v. Local Union 12447, United Steelworkers of America*, 591 F.2d 199 (3d Cir. 1978)).