Raymond J. DONOVAN, Secretary of Labor, U.S. Department of Labor, Plaintiff,

v.

LOCAL 998, AMALGAMATED TRANSIT UNION, AFL–CIO, Defendant.

Civ. A. No. 82–C–1567.

United States District Court, E.D. Wisconsin.

Sept. 19, 1983.

Joseph P. Stadtmueller, U.S. Atty. by Melvin K. Washington, Asst. U.S. Atty., Milwaukee, Wis., Francis X. Lilly, Deputy Sol. of Labor, Washington, D.C., John H. Secaras, Regional Sol., Peter D. Broitman, Janet M. Graney, Chicago, Ill., for plaintiff.

John S. Williamson, Jr., Milwaukee, Wis., for defendant.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

Before the Court is a motion of the plaintiff Secretary of Labor to certify the results of an election for the offices of president and recording secretary of the defendant Local 998. The defendant objects to certain determinations made by the Labor Secretary in supervising the union election. Local 998 has filed a cross motion for summary judgment, requesting either that a new election be held or that incumbent President James W. Brown be certified as having been elected. Oral argument on these motions was heard on September 16, 1983. The facts of the case are as follows.

On December 10, 1982, the Labor Secretary filed a complaint under Title IV of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 401 et seq., to set aside the union's June 8, 1982 election for the offices of president and recording secretary. On April 8, 1983, the parties stipulated to hold a new election for the above offices for the remainder of their terms. On April 19, 1983, this Court ordered a new election in accordance with that stipulation. That order directed the union to hold a new election under the Labor Secretary's supervision, in accordance with Title IV of the LMRDA, and, "insofar as lawful and practicable," in accordance with union constitution and by-laws. The Labor Secretary's interpretations of Title IV regarding the supervised election were to be final. This Court retained jurisdiction to certify the results of the election.

A pre-election conference was called by the Secretary on May 9, 1983 to determine the election procedures for the supervised election. All union members were invited. In attendance were Labor Department representatives, representatives of candidates James Groppi and James Brown, as well as concerned members of the union. At the meeting a consensus was reached that a tie vote was to be broken by a coin toss. On May 11, 1983, a letter confirming the "agreements" as to election procedures was mailed to those who attended the meeting, inviting protests from any union members in good standing. No protests were received by the Labor Department.

The supervised election was held on June 7, 1983. It resulted in a tie vote between Groppi and Brown. Thereupon, a coin toss was scheduled for June 16, 1983.

On June 14, 1983, incumbent President Brown and three election committee members protested certain election irregularities and challenged seven ballots cast for Groppi. The coin toss was postponed pending the Secretary's investigation of the protests. Following that investigation, the Labor Secretary determined that the protests had no merit. The vote stood as a tie. A coin toss thus was set for July 11, 1983.

On July 7, 1983, at its regular union meeting, the membership of Local 998 voted forty to fourteen out of a total membership of 1,500 to forego the coin toss and to hold a new election. On July 8, 1983, both candidates Groppi and Brown advised the Secretary in writing of their desire to hold a new election in lieu of the coin toss. Finally, on July 14, 1983, the Labor Department notified the parties that a coin toss would be conducted July 20, 1983 *unless both* candidates signed a Stipulation and Order for this Court's approval. The stipulation provided that a new election would be held on or before October 20, 1983 and that both candidates agreed to waive all protests of the June 7, 1983 election tie.

Candidate Groppi refused to sign that stipulation. The coin toss ultimately was conducted, and Groppi emerged victorious. The Labor Department then moved for court certification of Groppi's election in accordance with the Court's order of April 19, 1983.

Local 998 challenges both the propriety of deciding the election by coin flip and the Secretary's decisions to count seven ballots cast at the supervised election, which ballots had been voided by the union Election Committee as containing irregularities. With regard to these election protests, the Court makes the following findings of fact.

After the Secretary determined that the June 7, 1983 election had ended in a tie, six union members lodged protests with the Labor Department. The Secretary then conducted an investigation to determine the merits of the protests filed. In this suit, the defendant challenges the Secretary's finding of "no merit" to three protests filed by incumbent President James Brown and Election Committee members Lawrence W. Tepper, Edward N. Totsky, and Janice Fields.

The first protest alleges that the Secretary improperly counted a ballot cast by an ineligible voter. The procedure for counting ballots and for determining voter eligibility is as follows. A voter first shows his written identification and signs the voters' register. If the voter's name appears on the polling site's voter eligibility list, his name is lined off such list, he is given a ballot and is told to place the marked ballot in the ballot box. If the voter's name does *not* appear on the eligibility list, he is allowed to vote, *but* he must place his marked ballot in an "inner envelope" having no identification marking. That inner envelope then is placed in a larger envelope bearing the voter's name, and is placed in the ballot box. The eligibility of these challenged ballots is determined when all the ballots from the polling place are finally counted. Before counting, the challenged ballots are separated, and the names then are determined to be eligible or not. If ineligible, the ballot is set aside. If eligible, the inner envelope is removed and the ballot itself is intermingled with the other ballots.

One challenged ballot was found to be ineligible during the election. According to the Secretary, the ballot was found at the Fond du Lac site and was set aside. At that site, the number of ballots counted ultimately corresponded to the number of eligible voters who voted.

However, at the Kinnickinnic polling place, the inner envelope of a challenged ballot was found to be empty during the ballot count. According to the Secretary, this empty ballot was discovered only after all challenges at the Kinnickinnic poll had been resolved as eligible. The Labor Secretary thus found the protest regarding the ineligible voter to be without merit because, even if the challenged voter had voted his ballot without placing it in the proper envelopes, it would not affect the election outcome because it would have been determined that he was eligible to vote.

The second of the protests alleged that three ballots containing erasures should not have been counted by the Secretary. Following his investigation of this protest, the Labor Secretary found the following facts. First, the union constitution and by-laws do not require the voiding of erased ballots. Second, Local 998 had no past policy or practice of voiding erased ballots. Third, no Department of Labor representative told

President Brown he could void erased ballots if such an election rule were announced at the June 2d union membership meeting. Finally, union members were not instructed that this "no erasure" rule would apply.

Thus, the Secretary concluded that there were no "published" guidelines regarding ballot erasures in effect at the time of the election. The Secretary further found no evidence of tampering and that the voters' intent was clear; the protest was without merit.

The third protest to the supervised election alleged that two pair of ballots should not have been counted because each pair was folded identically. Again the Secretary investigated the complaint and found that these challenged ballots were presented as four separate ballots with two pair having similar folds; the ballots were not presented to him folded together.

He further found that the following safeguards were employed at the election to ensure ballot secrecy. Voter identification was required; each voter signed the voter register; each ballot was stamped by the Labor Department when distributed; all votes were cast in voting booths; the entire process was observed by between one and three election supervisors; finally, after the voting, all ballots were sealed and brought to the union office for opening. Thus, the Secretary concluded there was no merit to the claim that the folding of these ballots breached the secrecy requirement.

This Court must decide at the outset whether a new election must be conducted for the offices of president and recording secretary of Local 998, or whether the coin toss was a permissible means of resolving the tie vote. If the Court finds that a new election is not required, then it must review the Labor Department's actions in counting seven ballots of the June 7, 1983 election which Local 998's Election Committee had voided. This second inquiry will determine whether, in fact, the vote should have resulted in a tie.

Local 998 asserts that a new election is required for two reasons. First, as a legal matter, the Secretary acted arbitrarily, capriciously, and in violation of the LMRDA in requiring a coin toss. Second, the ballot of an ineligible voter was counted in the June 7, 1983 election, and it is not known for whom that vote was cast.

Local 998 further asserts that its Election Committee was correct in voiding three ballots containing erasures and two sets of two ballots having identical folds. The Labor Department overruled the Committee and counted these seven ballots.

## CONCLUSIONS OF LAW

### I. *Secretary's Decision to Use Coin Toss*

A. Standard for challenging determinations of Labor Secretary in supervising the June 7, 1983 election

Title IV of the LMRDA was intended by Congress as a means of ensuring free and democratic union elections. As a remedy for violations of the Act, Congress provided that the Labor Secretary would supervise new elections. It was believed that the protective presence of a neutral Labor Secretary, exercising his special knowledge and expertise, would best prevent the unfairness of the first election from infecting the remedial election. *Wirtz v. Local 153,* 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968).

Once intervention of the Labor Secretary has been properly invoked and a supervised election ordered by the court, an election supervisor must be afforded a wide range of discretion in discharging his supervisory responsibility. If the union, or its incumbent leadership, or any other interested party wishes to object to any action taken by the Secretary in his supervisory capacity, that party assumes a heavy burden of persuasion and proof to show that the Secretary's action was arbitrary, capricious, or otherwise not in accordance with law. *See Brennan v. Local 551,* 486 F.2d 6 (7th Cir.1973).

An additional legislative policy underlying the Labor Act is that of avoiding unnecessary governmental interference with internal union affairs. Toward this

end, the Secretary should make his decisions only after consultation with interested parties, including the incumbent union leadership. Such consultation, however, is not the equivalent of negotiation between equal parties, and the Secretary's final decisions cannot be considered negotiated consent decrees. After consulting with interested parties, the Secretary should consider a variety of factors, including expense, possible impact on pending negotiations, or any other matters that he, in his impartial expertise, deems relevant. The weight to be accorded such factors is for the Secretary to decide. *See Local 551,* 486 F.2d at 7–8.

### B. Application of the arbitrary/capricious standard

In evaluating the reasonableness of the Labor Secretary's decision to resolve the tie vote by coin flip, the Court must review his action on the basis of the facts available to him when his decision was made. In this case, the Secretary convened a preelection conference of all interested parties to assist him in establishing election procedures. By consulting representatives of both candidates and other interested parties and by inviting comment on proposed procedures from all union members, the Labor Secretary hoped to avoid unilateral decisionmaking. When, after the election was held, the candidates expressed dissatisfaction with the procedure adopted by the Secretary in his discretion for resolving a tie vote, the Labor Department as election supervisor was willing to revise the election procedure after-the-fact if the candidates could agree that a new election was a better solution and if such was approved by the Court. A consensus favoring a new election did not develop, and the Secretary retained the procedure he originally approved.

■ The Labor Secretary bases his decision to employ the coin toss *not* on the presence or absence of any binding agreement among the candidates for office, the union, and the Labor Department. Rather, the Secretary's original approval of the tie-breaking procedure and his subsequent refusal to revise that method without the court-approved consensus was based on a confluence of factors. Because a significant number of union members took their vacations during the summer, the new election could not be held until at least September. In addition to the several months' delay, a new election would require a further financial investment that would not be insubstantial. Moreover, the investments of time and money would be even greater should the election result in a second tie. Finally, the Labor Secretary did not regard the use of a coin toss to break an election tie as inherently contrary to the notion of a free and democratic election, inasmuch as the method was employed by various state legislatures and labor organizations to resolve tie votes.

For several reasons, the defendants herein believe the Secretary's decisionmaking process to be arbitrary, capricious and unreasonable. Their argument suggests that it was unreasonable for the Labor Secretary to rely on the results of the pre-election conference. At that conference, a tie vote was considered highly unlikely; a resolution of that possibility was discussed in a cursory manner by parties in attendance who had no authority to commit the union to the expense of a new election.

The defendants further contend that the union membership, by a vote of 40 to 14, expressed its desire to undertake the financial expense of a new election rather than have its officers chosen by a coin flip. Moreover, they argue that the language of this Court's stipulated order of April 19, 1983, the union's constitution and by-laws, and Title IV of the Labor Act itself refer only to the "election" of union officers; they make no provision for the selection of officers by means of chance in order to save money.

Upon review of the entire record before me, I am not persuaded that the defendant union has met its burden of proof in this case. That burden is a high one, and only a showing of arbitrariness and capriciousness will justify this Court in interfering with the broad discretion bestowed upon the Labor Department in supervising union elec-

tions. The test is *not* one of equity and fairness as the defendant suggests; it is whether the Secretary's conduct was without reason and principle.

The Labor Secretary's decision to proceed with the coin toss in this case was not unreasonable under all the facts and circumstances. The tossing of a coin to break a tie vote is hardly foreign to the spirit of a free and democratic society. In light of the time and expense required of another supervised election, the use of a coin flip by the Secretary was neither arbitrary nor capricious.

II. *Secretary's Determinations Regarding the Election Protests.*

In reviewing the Labor Secretary's denial of the election protests, the test again is whether his decisions were arbitrary and capricious, that is, whether there is a rational and defensible basis for the Labor Secretary's determinations as evidenced by the reasons he states. Because of the Secretary's recognized expertise and familiarity with supervised elections, his exercise of discretion enjoys a presumption of fairness and regularity into which the court may not routinely intrude. In fact, under the Supreme Court's rule in *Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), judicial review of decisions of the Labor Department regarding election irregularities may not extend to the factual bases underlying those determinations. The issue is only whether the Secretary's conclusions flow rationally from his factual findings. The Secretary is not required to come forward with counter affidavits to assist the Court in conducting a mini-trial of his findings of fact.

In this case, the defendant union undertakes an extensive attack on the Secretary's investigation of the election protests and the factual findings he draws therefrom. It is not, however, this Court's function to act as an election supervisor and conduct its own investigation of the election in this case. Such a role is fundamentally inconsistent with the remedial scheme envisioned by Congress in using the broad discretion of Labor Department representatives to supervise union elections.

Employing the standard of arbitrary and capricious conduct, and accepting as true the factual foundation of the Secretary's conclusions, I must find that his denial of the defendant's protests was not arbitrary. A new election in this case is not mandated by law, the June 7, 1983 election properly was determined to be a tie, and by virtue of the coin toss James E. Groppi was elected union president and Gerald M. Brzakala was elected recording secretary. It is so certified.

THEREFORE, IT IS ORDERED that the defendant's motion for summary judgment is denied and the plaintiff's motion for entry of final judgment is granted.